[Civ. No. 15498. First Dist., Div. One. Sept. 11, 1953.]

BURTON H. KENNERSON, Respondent, v. BURBANK
AMUSEMENT COMPANY, INC. (a Corporation) et
al., Appellants.

Arvin O. Robb for Appellants.

John H. Machado for Respondent.

PETERS, P. J.—Plaintiff brought this action against defendants for damages for the claimed breach of an employment contract. The trial court found in favor of plaintiff and granted him a judgment for $49,140, the full prayer of the complaint. Defendants appeal.

Before recounting the facts, the principal characters in this complicated drama of corporate machinations should be identified.

Plaintiff, Burton H. Kennerson, when these transactions occurred, had been in the theatre business for 24 years, 18 of which he had spent in a managing capacity. He was one of the organizers of the two corporate defendants, and was a director of Burbank Amusement Company when that corporation executed the contract here involved.

The two defendants are Burbank Amusement Company, and Beverly Investment Company, related corporations. The contract here involved was between Kennerson and Burbank. Prior to the institution of this action Burbank was merged with Beverly, Beverly assumed the debts and liabilities of Burbank, and Burbank went out of existence. It is because of such assumption that Beverly is here made a defendant.

Fred M. Salih, although not a party to this action, should also be identified. At the times here involved he was a partner in a firm of building contractors that specialized in theatre construction, and was the owner of several theatres. He planned with Kennerson the creation of the two corporate defendants. He was Beverly's principal witness.

Our story opens in March of 1949. In that month Kennerson and Salih agreed that a theatre should be constructed by Salih in the Burbank suburb of San Jose upon land to be provided by Salih. It was Kennerson's idea to form two corporations, one Beverly, with a stated capital of $200,000 to purchase the land, and to build, pay for and to hold the constructed theatre, and the other, Burbank, with a stated capital of $60,000, to run the theatre and included stores. The parties also agreed that half of the total stock of both corporations would be sold to members of Salih's family, and that Kennerson was to sell shares to persons in San Jose. It was understood that Salih was to furnish the land and build the theatre for $200,000. Salih immediately started construction in June of 1949, and in September of 1949 entered into a formal construction contract with Beverly.

It was understood between the organizers of the two corporations that Beverly was to have 20,000 shares, with a par value of $10 each, and that the operating corporation, Burbank, was to have 6,000 shares of the same par value. Salih testified that it was understood that the purchaser of 10 shares of Beverly was to purchase three shares of Burbank so as to maintain a proportional interest in each corporation. Kennerson could not remember whether this had been agreed upon, and there is no writing in the record incorporating this concept. There was certainly no prohibition in the articles or bylaws against any stockholder selling his interest in either or both corporations. With its $60,000 capital Burbank was to buy equipment for the theatre, and ultimately did so.

The two corporations were incorporated in June of 1949, and permits secured for the issuance of stock. Kennerson was elected a director of Burbank, and later also secretary-

treasurer. Salih was elected a director of both corporations, and also, apparently, president of both.

In November of 1949, the theatre being still unfinished, Beverly leased to Burbank the theatre and two upstairs office suites and four street level stores, for 10 years, at a total rental of $200,000, with an option in Burbank to renew the lease for 40 years.

Between November of 1949 and January of 1950 Kennerson decided that he wanted a contract to manage the theatre involved, and believed that he had the approval of the majority of the then directors of Burbank, but apparently feared that those directors would be voted out as directors at a stockholders' meeting of Burbank, then impending. A joint meeting of both boards was called for January 11, 1950. Prior to that date Salih and Kennerson had seriously disagreed on several matters. At this January 11th meeting all directors of both boards were present, and Kennerson presented to them a proposed contract between Kennerson and Burbank whereby Kennerson was to be employed to manage the then still unfinished theatre. Salih, and directors Kneeshaw and Brady of the Beverly board, opposed the contract, on many grounds, including the claim that it was unfair to the corporation, the charge that Kennerson was not morally fit because of his recent arrest on some unspecified charge, and that he had been approved as a director by the Department of Corporations under a misapprehension. Over the objection of the Beverly directors, the Burbank directors removed Salih as president, and, by resolution, called a special meeting of the Burbank directors for January 20, 1950, for the purpose of considering the Kennerson contract proposal.

The January 20, 1950, directors' meeting of Burbank was duly noticed, but only three—Kennerson, Thorp, the new president, and Rundle—attended, two directors being absent. Several members of the Beverly board were also present. Kneeshaw and Brady, of the Beverly board, vigorously objected to the proposed contract on the ground that it was financially unsound to enter into such a contract before the theatre was finished, that it was unfair to do so when only three directors of Burbank, one of whom was interested, were present, and on other grounds. Kneeshaw testified that Kennerson insisted on proceeding because he feared that the new directors of Burbank that would be elected at the next stockholders' meeting, to be shortly held, might not favor the

contract. After a prolonged argument the three Burbank directors retired to another room where they, by the votes of Thorp and Rundle, Kennerson not voting, approved the contract, and authorized Thorp to execute it on behalf of Burbank. At this time the theatre was but 70 per cent complete, Beverly had sold but $78,500 of its shares, $75,000 of which had been paid to Salih, and Beverly owed Salih an additional $80,000. Burbank had sold $19,950 of its stock.

The resolution authorizing and approving the contract with Kennerson contained the following clause which was not incorporated into the later executed contract: ''provided, nevertheless, that said approval is made upon the express agreement of B. H. Kennerson that such agreement may be modified in any respect or abrogated completely by a majority vote of the present members of the Board of Directors of this corporation.''

The contract was duly signed and executed on the same day, January 20, 1950. The contract contains the following clauses:

''1. The First Party does hereby hire and/or employ the Second Party to act as General Manager of the Manor Theatre in each and all of its business operations and in all of its business dealings and operations in relation to the operation of the Manor Theatre for a period of five (5) years beginning seven days prior to the opening of the Manor Theatre in the Burbank District, Santa Clara County, California, for the agreed salary of $125.00 per week, payable weekly, plus five (5%) per cent of the gross amount of sales from all concessions such as candy, popcorn, beverages, etc., payable weekly, and Second Party agrees in return for the said five (5%) per cent to pay for all inventory shortages.

''2. The Second Party shall have the sole authority and jurisdiction in purchasing and booking all motion pictures, stage attractions and other forms of entertainment to be used at the Manor Theatre.

''3. The Second Party shall have the exclusive right to fix and establish all policies to be followed in the operation of the Manor Theatre, and to determine all charges for admission and to hire and discharge all necessary help to operate and maintain said theatre and fix all salaries and wages to be paid such help.

''4. The Second Party shall have exclusive right to sign all contracts for and on behalf of the First Party in relation to the Manor Theatre and to sign all checks to be used in connection with the operation of the Manor Theatre.

"5. The Second Party shall have the right to carry on any other business for his benefit, or engage in other work during the term of this contract, it being understood, however, that he will at all times manage the business of the First Party in a first-class manner. Second Party undertakes that the operation of said theatre will show a revenue in excess of operating costs, excluding depreciation and rent," and excluding certain catastrophes or acts of the Board of Directors of Burbank.

By clause 6 Kennerson agreed to render a semiannual report summarizing his operations to the board of Burbank or to appear and answer questions relating to such operations. Clause 7 confers on certain shareholders of Burbank the power of cancellation in language completely different from that in the resolution of the board authorizing the contract. It reads as follows: "7. This contract may be cancelled by First Party at any time within one (1) year from the date hereof by giving sixty (60) days written notice to Second Party, and upon written consent of more than eighty (80%) per cent of those persons to whom the stock of First Party was originally issued, regardless of the number of shares of stock originally issued to them and regardless of whether or not they continue to be shareholders, and together with approval of a majority of the Board of Directors."

The 8th paragraph continues the contract for five years but provides that unless then terminated by the notices therein provided it shall continue for an additional two years. Paragraph 9 provides for vacations. The next paragraph reads as follows: "10. It is understood that all money earned, collected and taken in on account of the Manor Theatre business of the First Party shall be deposited in the Hester Branch of the Bank of America, San Jose, California, in the name of the First Party, and from said bank account all operating expenses and other expenses of the Manor Theatre shall be paid by the Second Party before withdrawal of funds for other purposes, and First Party shall authorize said bank to permit Second Party to draw checks on said account."

The last paragraph makes its terms binding upon heirs, successors and assigns of the parties.

Two directors, Salih and Callisch, were not present at the meeting at which the resolution authorizing the execution of the contract was passed, but Callisch, some time later, "approved" the minutes. The contract was never presented to or approved by the stockholders of Burbank.

The execution of this contract led to a widening of the split between the factions, and to the filing of a series of lawsuits. Among other things, Salih's attorney wrote to the Corporation Commissioner pointing out that because Kennerson had seized control of Burbank the original purpose of organizing two corporations had been frustrated, and requested the suspension or revocation of Burbank's permit. On February 23, 1950, the commissioner issued a desist and refrain order stopping all sales of the securities of both corporations, which, of course, tied up the financial development of both corporations. Just before this order became effective Salih increased his and his family's holdings, by purchasing an additional 3,400 shares in Beverly. At the time of the January 20th meeting he had owned but 10 shares in Beverly, and but three shares in Burbank. At this time Beverly owed Salih about $130,000, and most of the money paid for the 3,400 shares was immediately repaid to Salih to apply on this debt.

In the meantime, in January of 1950, the Colombini family became a substantial stockholder in Burbank, and in May, 1950, in Beverly. All during this time various lawsuits were pending in which the Colombinis and the Salihs were opponents. But on May 4, 1950, they settled their differences, by a formal written contract, by which they agreed to work together to secure a merger of the two corporations. It was agreed that certain actions should be dismissed and that, until the merger, the Salihs should own 3,510 shares, Joseph Brady 2,000 shares, and the Colombini family 2,600 shares of Beverly. Salih was empowered to sell 4,000 shares to outsiders, and agreed to purchase the Colombini shares one year later if the Colombinis desired to sell.

In June of 1950, at a Burbank stockholders' meeting, the Salih faction attempted to merge that corporation with Beverly, but was unable to muster enough votes. One of the main purposes of the proposed merger was to cancel the employment contract of Kennerson, although Kennerson denied knowledge of this purpose, but he did know that merger plans were being discussed. Under these circumstances a special meeting of the board of directors of Burbank was called for August 11, 1950. At this time the directors were Maurice Sherman, Paul Navarra, Kennerson, George Honore and Nate Thorp, Salih apparently having been defeated as director in February of 1950. Thorp was chairman, but had died just before the August 11th meeting. One of the Colom-

binis was president of the corporation. At this special meeting Sherman, Navarra and Kennerson appeared, Honore being absent and Thorp being dead. Sherman was elected chairman of the board, Frank Callisch was elected to fill the unexpired term of Thorp, Colombini was removed as president and George Mendoza elected in his place, and Kennerson, who until then had only been a director, was elected secretary-treasurer of Burbank. A previous formal offer to the Salih family to sell them designated quantities of Burbank stock was revoked. Then the members present adopted the following resolution: "BE IT RESOLVED that the Agreeement of Employment . . . with B. H. Kennerson . . . be, and the same is hereby, ratified and approved, and that the right of abrogation and modification given to the Board of Directors at said meeting of January 20, 1950 be, and the same is hereby removed as a condition of said Agreement of Employment and that the present Board shall not have the right of modification or abrogation of said contract as was given the Board of Directors under the resolution of January 20, 1950."

The board also by resolution authorized Kennerson to employ a broker to rent the stores and offices in the theatre building.

Attached to these minutes is an undated page signed with six signatures by which the signatories, "constituting all of the Directors of Burbank Amusement Co., Inc. do hereby consent to the holding of the foregoing meeting . . . and do hereby ratify and approve all of the acts of the said Directors at said meeting as disclosed by the foregoing minutes." Then follow the signatures of Mendoza, who apparently was not a director (although the new president), Kennerson, Sherman, Callisch, Navarra, and a somewhat illegible name, but apparently that of director George Honore. At this time, these directors owned, collectively, but a very small proportion of the total outstanding shares of Burbank.

Although the minutes recite that the resolution cancelling the abrogation clause was "unanimously carried," Kennerson testified that he did not vote upon it but that it was carried by the votes of Navarra and Sherman, the only two other directors present. Kennerson admitted that no consideration passed from him for the cancellation of this right of abrogation.

The theatre building was still incomplete at the time of this August, 1950, meeting, but probably was nearing com-

pletion. Large sums, possibly over $86,000, were owed to Salih at this time.

Almost immediately after the August 11, 1950, board meeting, a meeting of the stockholders of Burbank was called for September 4, 1950. At this meeting, by the required two-thirds majority, the stockholders voted to merge with Beverly on the basis of the exchange of one Burbank share for one Beverly share, and upon the agreement of Beverly to take over Burbank's assets and to assume its liabilities. The existing board of directors of Burbank was recalled, and a new board elected. The new board consisted of Salih, two Colombinis, Sherman, and Kennerson.

A duly noticed meeting of the new board of Burbank was called for September 19, 1950, at which four of the directors were present, Salih, two Colombinis, and Kennerson—Sherman being absent. Kennerson objected to the meeting, but his objections were overruled. Salih was elected president and a Colombini was elected secretary-treasurer. By formal resolution approved by Salih and the two Colombinis, with Kennerson abstaining, the merger was approved. (The certificate of merger was filed September 28, 1950.) By the same vote the following resolution was adopted: "RESOLVED that the contract agreement heretofore entered into . . . employing the said Burton H. Kennerson as manager of the Manor Theatre . . . be cancelled." Formal demand was made upon Kennerson for the books, records and files of the corporation. It should be here mentioned that later, in a mandate action, Kennerson testified that he did not know where the books were, and the mandate action was dismissed.

Salih and the Colombinis testified that they did not know at the time of this September 19, 1950, meeting that the previous board on August 11, 1950, had attempted to abrogate the cancellation clause. They voted on September 19, 1950, to cancel Kennerson's contract in the belief that they had such right under the original resolution of January 20, 1950.

Kennerson testified that he was at all times ready, able, and willing to carry on under the contract, and in February, 1951, demanded of Beverly the right to do so. This action was filed March 20, 1951.

The trial court found that the contract had been entered into as pleaded; that it had never been cancelled as therein provided; that it was still in full force and effect; that it did not improperly delegate authority to Kennerson; that

Kennerson was ready to perform but had been, improperly, prevented; that the contract was "fair, just and reasonable"; that the contract was authorized, approved and ratified in good faith and in the interest of the corporation; that the financial interest of Kennerson was at all times disclosed and known to the board; that the approving vote was sufficient; and that the directors had authority to enter into the contract. Damages at $125 a week for the full seven years, with $10 a week for the concession, were awarded, and judgment granted for $49,140.

Although the factual situation is somewhat confused, certain facts clearly stand out. The two corporations were closely integrated, with Beverly putting up the capital for the land and building. Kennerson had but a very small investment in either corporation. When the joint meeting of the two boards was held on January 11, 1950, the Beverly board vigorously opposed the contract by which it was proposed to give Kennerson a contract whereby he was to control the entire business of Burbank and the sole asset of Beverly. Present at the January 20, 1950, meeting of the board of Burbank were but three of the five directors, one of whom was Kennerson. None of those present had a substantial interest in Burbank. They knew of the hot controversy over the Kennerson contract and knew of the impending stockholders' meeting of Burbank at which a new board was to be elected. Under these circumstances by a vote of two directors, and over the opposition of the directors of Beverly, the president was authorized to execute a contract. The resolution approving the contract was made upon the express agreement of Kennerson that the contract of employment could be modified or abrogated "by a majority vote of the present members of the Board of Directors." Thus, the members of the Burbank board attempted to keep in the hands of the then members of that board the power to modify or abrogate the contract even though they might not be members of a future board or have any interest at all in the corporation.

The contract as executed did not contain the abrogation clause as authorized, but contained a clause entirely different from that authorized. The new clause purported to limit the cancellation power of Burbank to the first year of the contract, and required the written consent of 80 per cent "of those persons to whom the stock of First Party was originally issued." These persons might have sold their stock and

might have no interest in the corporation at all when such power was sought to be exercised, but nevertheless it was attempted, by this unauthorized clause, to give them the power to control the destinies of Burbank so far as Kennerson's contract was concerned.

Callisch, a director of Burbank, absent from the January 20th meeting, "approved" the minutes of that meeting. The contract was never presented to or approved by the stockholders of Burbank.

Then with merger plans being discussed, and with it becoming increasingly evident that a merger would probably occur as soon as consent of the necessary two-thirds of the stockholders of Burbank could be secured, a special meeting of the Burbank board was held on August 11, 1950. Again but three directors, one of whom was Kennerson, were present. By a vote of two directors, a resolution was adopted purporting to ratify the Kennerson contract, and, without any consideration moving from Kennerson, the resolution purported to remove the cancellation provision contained in the January 20, 1950, resolution. The absent director, and a director newly elected at that meeting purported to ratify and approve this action. Although a new board of directors of Burbank was elected on September 4, 1950, and a special meeting of the newly elected board was called for September 19, 1950, the old board kept from the new board all knowledge of the resolution of August 11th.

The terms of Kennerson's contract must also be mentioned. He is employed as manager of the theatre "in each and all of its business operations" for a period of five years and possibly seven, at a total salary of $45,500, plus a commission. As manager he was to have "sole authority and jurisdiction" to book theatre engagements, the "exclusive right" to "fix and establish all policies to be followed in the operation of the Manor Theatre," to determine charges, to hire, fire and fix all salaries of all personnel, and the "exclusive right" to sign all contracts and checks in relation to the operation of the theatre. He was permitted to engage in other employment. He was required to render a semi-annual report to the Burbank board. Although money from operations was to be deposited in the bank in the name of Burbank, Kennerson was authorized to pay all expenses therefrom and draw checks thereon.

It must be remembered that Burbank's sole asset was its management contract with Beverly, and its interest in the

furnishings of the theatre. By this contract all of the functions of Burbank, except the rights to receive semiannual reports from Kennerson and to question him, including control over all of the corporate policies, including finances, was turned over to Kennerson.

These transactions are attacked on the ground that the basic resolutions and contract were void because they violated the provisions of section 820 of the Corporations Code. That section provides:

"Directors and officers shall exercise their powers in good faith, and with a view to the interests of the corporation. No contract or other transaction between a corporation and one or more of its directors, or between a corporation and any corporation, firm, or association in which one or more of its directors are directors or are financially interested, is either void or voidable because such director or directors are present at the meeting of the board of directors or a committee thereof which authorizes or approves the contract or transaction, or because his or their votes are counted for such purpose, if the circumstances specified in any of the following subdivisions exist:

"(a) The fact of the common directorship or financial interest is disclosed or known to the board of directors or committee and noted in the minutes, and the board or committee authorizes, approves, or ratifies the contract or transaction in good faith by a vote sufficient for the purpose without counting the vote or votes of such director or directors.

"(b) The fact of the common directorship or financial interest is disclosed or known to the shareholders, and they approve or ratify the contract or transaction in good faith by a majority vote or written consent of shareholders entitled to vote.

"(c) The contract or transaction is just and reasonable as to the corporation at the time it is authorized or approved.

"Common or interested directors may be counted in determining the presence of a quorum at a meeting of the board of directors or a committee thereof which authorizes, approves, or ratifies a contract or transaction."

It is contended that the basic resolutions of January 20th and August 11th were void because not passed by a "vote sufficient for the purpose," within the meaning of subdivision (a) because such resolutions were passed by the vote of but two of the five directors. It is contended that prior to the adoption of section 820 if a director necessary to constitute

a quorum was interested in a transaction voted by a majority of the quorum, with or without his vote, the transaction was voidable. A qualified disinterested quorum was necessary to transact business. There are many cases broadly intimating that this was the law prior to the adoption of section 820. (See *Anderson* v. *Calaveras Cent. Min. Corp.*, 13 Cal.App.2d 338, 348 [57 P.2d 560] ; also cases collected, Corporations Code Anno., p. 70.) There are several cases indicating that this has remained the law subsequent to the adoption of section 820. (*Angelus Securities Corp.* v. *Ball*, 20 Cal.App. 2d 423, 432 [67 P.2d 152] ; *Pece* v. *Tama Trading Co.*, 22 Cal.App.2d 219, 223 [70 P.2d 652].) Of course, section 816 of the Corporations Code provides that a quorum consists of a majority of the directors, the bylaws of Burbank provide that three directors shall constitute a quorum, and section 817 provides or implies that a majority of the quorum may transact business. It is also argued that if the resolutions were void, they could not be ratified by a subsequent approval of the minutes. Section 820(a), however, apparently recognizes ratification as a method of approving a resolution in which a director is interested.

These arguments present some very interesting questions, but they need not be decided here, because we are of the opinion that the contract here involved was void for other reasons. Section 800 of the Corporations Code provides that "all corporate powers shall be exercised by or under authority of" the board of directors. Section 820, in its very first sentence, requires that "Directors and officers shall exercise their powers in good faith, and with a view to the interests of the corporation." In addition, it is the law that "Even though the requirements of section 820 are technically met, transactions that are unfair and unreasonable to the corporation may be avoided." (*Remillard Brick Co.* v. *Remillard-Dandini*, 109 Cal.App.2d 405, 418 [241 P.2d 66] ; see, also, *Brainard* v. *De La Montanya*, 18 Cal.2d 502, 510 [116 P.2d 66].)

There are several statements in the Remillard case that are applicable here. At page 418 it is stated:

"But neither section 820 of the Corporations Code nor any other provision of the law automatically validates such transactions simply because there has been a disclosure and approval by the majority of the stockholders. That section does not operate to limit the fiduciary duties owed by a director to all the stockholders, nor does it operate to

condone acts which, without the existence of a common directorate, would not be countenanced. ▪ That section does not permit an officer or director, by an abuse of his power, to obtain an unfair advantage or profit for himself at the expense of the corporation. ▪ The director cannot, by reason of his position, drive a harsh and unfair bargain with the corporation he is supposed to represent. If he does so, he may be compelled to account for unfair profits made in disregard of his duty. ▪ Even though the requirements of section 820 are technically met, transactions that are unfair and unreasonable to the corporation may be avoided. (California Corporation Laws by Ballantine and Sterling (1949 ed.), p. 102, § 84.) It would be a shocking concept of corporate morality to hold that because the majority directors or stockholders disclose their purpose and interest, they may strip a corporation of its assets to their own financial advantage, and that the minority is without legal redress. . . .

▪ "It is hornbook law that directors, while not strictly trustees, are fiduciaries, and bear a fiduciary relationship to the corporation, and to all the stockholders. ▪ They owe a duty to all stockholders, including the minority stockholders, and must administer their duties for the common benefit. The concept that a corporation is an entity cannot operate so as to lessen the duties owed to all of the stockholders. ▪ Directors owe a duty of highest good faith to the corporation and its stockholders. ▪ It is a cardinal principle of corporate law that a director cannot, at the expense of the corporation, make an unfair profit from his position. ▪ He is precluded from receiving any personal advantage without fullest disclosure to and consent of all those affected. ▪ The law zealously regards contracts between corporations with interlocking directorates, will carefully scrutinize all such transactions, and in case of unfair dealing to the detriment of minority stockholders, will grant appropriate relief. ▪ Where the transaction greatly benefits one corporation at the expense of another, and especially if it personally benefits the majority directors, it will and should be set aside. In other words, while the transaction is not voidable simply because an interested director participated, it will not be upheld if it is unfair to the minority stockholders. These principles are the law in practically all jurisdictions. (3 Fletcher, Cyclopedia of Corps. (Perm. ed.), p. 173, § 838, et seq.; 13 Am.Jur., p. 948, § 997 et seq.)

"The United States Supreme Court has clearly established these principles. In *Pepper* v. *Litton,* 308 U.S. 295 [60 S.Ct. 238, 84 L.Ed. 281], the court, unanimously, stated the following (p. 306) : 'A director is a fiduciary. [Citing a case.] ██ ██ So is a dominant or controlling stockholder or group of stockholders. [Citing a case.] Their powers are powers in trust. [Citing a case.] Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. [Citing a case.] The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside.'

██ Referring directly to the duties of a director the court stated (p. 311) : 'He who is in such a fiduciary position cannot serve himself first and his *cestuis* second. He cannot manipulate the affairs of his corporation to their detriment and in disregard of the standards of common decency and honesty. He cannot by the intervention of a corporate entity violate the ancient precept against serving two masters. He cannot by the use of the corporate device avail himself of privileges normally permitted outsiders in a race of creditors. He cannot utilize his inside information and his strategic position for his own preferment. He cannot violate rules of fair play by doing indirectly through the corporation what he could not do directly. He cannot use his power for his personal advantage and to the detriment of the stockholders and creditors no matter how absolute in terms that power may be and no matter how meticulous he is to satisfy technical requirements. For that power is at all times subject to the equitable limitation that it may not be exercised for the aggrandizement, preference, or advantage of the fiduciary to the exclusion or detriment of the *cestuis*. Where there is a violation of those principles, equity will undo the wrong or intervene to prevent its consummation.'

"This is the law of California. It was the law before section 311 of the Civil Code was adopted, and is the law since."

██ Inasmuch as the directors must exercise and maintain control over corporate affairs in good faith, they are prohibited from delegating such control and management to others, and

any contract so providing is void. By this contract with Kennerson the board has attempted to confer upon him the practical control and management of substantially all corporate powers. The sole asset of this corporation was the management of, and the fixtures in, the Manor Theatre building. By the contract the board has attempted to transfer all control over bookings, personnel, admission prices, salaries, contracts, expenses and even fiscal policies to Kennerson. While the contract provides that moneys are to be banked in the name of Burbank, Kennerson is granted full power to withdraw the same, subject to paying expenses. Kennerson is authorized to book "other forms of entertainment," so that he could, without restraint, change the very nature of the enterprise, and could even assign his powers to others. The fact that Kennerson is under a duty to make periodic reports to the board does not constitute a sufficient retention of control over discretionary corporate policies to comply with the rule.

Kennerson admits that it is the law that a board cannot divest itself of its fundamental powers by contract, but contends that the requirement that Kennerson must report and account saves this contract from violating this rule.

 California has recognized the rule that the board cannot delegate its function to govern. As long as the corporation exists, its affairs must be managed by the duly elected board. The board may grant authority to act, but it cannot delegate its function to govern. If it does so, the contract so providing is void. (*Smith* v. *California Thorn Cordage, Inc.*, 129 Cal.App. 93, 98 [18 P.2d 393]; see discussion and cases cited 6A Cal.Jur., p. 1095, § 615; p. 1132, § 643; Ballantine on Corporations (1946 ed.), p. 136, § 48.)

This also seems to be the general rule in this country. A case quite similar to the instant one is *Long Park* v. *Trenton-New Brunswick Theatres Co.*, 297 N.Y. 174 [77 N.E.2d 633]. There the New York Court of Appeals in a six-to-one decision held invalid, as a matter of law, a contract to manage a theatre business, which contract was somewhat similar to the one here involved. There the board attempted to delegate to another corporation the right to manage all the theatres leased or to be leased by the granting corporation. As in the instant case, full and uncontrolled authority over bookings, policies, admission prices and personnel was granted. The court held (p. 634 [77 N.E.2d]) that by such a contract "the powers of the directors over the management of its

theatres, the principal business of the corporation, were completely sterilized. Such restrictions and limitations upon the powers of the directors are clearly in violation of section 27 of the General Corporation Law of this state and the New Jersey statute.* [Citing cases.]'' (See, also, *Royal Theatre Corp.* v. *United States*, 66 F.Supp. 301; *Sherman & Ellis* v. *Indiana Mutual Casualty Co.*, 41 F.2d 588.)

Kennerson cites cases such as *Oliphant* v. *"Home Builders,"* 34 Cal.App. 720 [168 P. 700]; *Dyer Bros. Golden West I. Wks.* v. *Central I. Wks.*, 182 Cal. 588 [189 P. 445], and *San Diego Water Co.* v. *Flume Co.*, 108 Cal. 549 [41 P. 495, 29 L.R.A. 839], where contracts delegating some authority were upheld. But none of them involved the quantum of delegation here presented. The problem is, of course, one of degree. ▉ If the contract, as in the instant case, attempts to delegate substantially all corporate powers to an agent, then it has gone too far. Such a contract must be held to be void and unenforceable. The judgment enforcing such a contract must be reversed.

The judgment appealed from is reversed.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied October 9, 1953, and respondent's petition for a hearing by the Supreme Court was denied November 5, 1953.

---

*These statutes provided: "The business of a corporation shall be managed by its board of directors." Section 800 of the California Corporations Code provides: ". . . all corporate powers shall be exercised by or under the authority of, and the business and affairs of every corporation shall be controlled by, a board of not less than three directors."