**Robert M. McKINNEY, Plaintiff-Appellant, Cross-Appellee,**

**v.**

**GANNETT CO., INC., and The New Mexican, Inc., Defendants-Appellees, Cross-Appellants.**

**Nos. 81-2156, 81-2180 and 81-2181.**

United States Court of Appeals, Tenth Circuit.

Dec. 9, 1982.

Rehearing Denied March 28, 1983.

Victor R. Marshall, Albuquerque, N.M. (William A. Sloan and Edward Ricco, Albuquerque, N.M., with him on the brief), of Rodey, Dickason, Sloan, Akin & Robb, Albuquerque, N.M., for plaintiff-appellant.

Jerry Wertheim, Santa Fe, N.M. (Steven L. Tucker and H.R. Quintero, Santa Fe, N.M., with him on the brief), of Jones, Gallegos, Snead & Wertheim, Santa Fe, N.M., for defendant-appellee The New Mexican, Inc.

John B. McCrory, Rochester, N.Y. (William S. Brandt, Rochester, N.Y., with him on the brief) of Nixon, Hargrave, Devans & Doyle, Rochester, N.Y., and Ortega & Snead, Albuquerque, N.M., for defendant-appellee Gannett Co., Inc.

Before BARRETT, BREITENSTEIN and LOGAN, Circuit Judges.

BARRETT, Circuit Judge.

These consolidated appeals arise from a fourteen week jury trial, related post-trial hearings, and judgment ordering a rescission and accounting. The record is voluminous.[1] The facts will be developed only insofar as is necessary for our disposition on appeal.

In 1974 Robert M. McKinney (McKinney) was the owner of The New Mexican, Inc. (The New Mexican), a New Mexico corporation which publishes *The New Mexican,* a daily newspaper in Santa Fe, New Mexico. McKinney had been the owner and publisher of *The New Mexican* since 1949. Over the years McKinney also held numerous positions with other corporations and governmental agencies outside of Santa Fe. To this end McKinney maintained a New York apartment in addition to his Santa Fe residence. He employed a general manager to manage the day-to-day affairs of the newspaper. In early 1975, McKinney's physicians recommended that he move to a lower elevation in view of a recurring heart problem and his age. At the same time, McKinney decided to sell his newspaper.

McKinney subsequently commenced negotiations with Gannett Co., Inc. (Gannett), the largest newspaper chain in the United States. These negotiations culminated in an "Agreement and Plan of Reorganization" executed on December 18, 1975 by McKinney, McKinney's holding company, Gannett, and The New Mexican, Inc. Under the agreement, McKinney agreed to transfer all of the common stock of The New Mexican in exchange for 300,000 shares of Gannett stock valued at $11,700,000. The parties agreed that the agreement would be consummated at a later date after several related issues, including an employment contract, had been resolved and related documents had been finalized.

The agreement, as supplemented and amended, was executed on February 27, 1976. The final agreement included McKinney's sale of the *Taos News,* a second newspaper which he owned. At McKinney's request he was granted an oral option to reacquire this newspaper after two years, in accordance with his earlier plans to gift it to his daughter. The agreement also included a ten year employment contract between McKinney and The New Mexican, whereby McKinney was to be in complete charge of the business, operations, news and editorial policies of the newspaper for the first five years, and in complete charge of the news and editorial policies for the second five years. The contract provided

1. Although the parties stipulated to a six volume appendix, we found the appendix inadequate. Subsequent to oral arguments we ordered up the entire transcript consisting of 71 volumes, which we have carefully and laboriously reviewed.

that McKinney was not required to devote all of his time, skill or energy to the newspapers and that he could "in accordance with his customary past practice", devote such time and effort to the performance of his duties, in such manner, in such place or places, and to such extent, as he may individually and solely determine. In conjunction with his employment contract, McKinney was afforded an office, a car, and an annual salary of $30,000.00. Pursuant to the initial agreement, McKinney transferred all the stock of The New Mexican to Gannett, and Gannett transferred 300,000 shares of Gannett stock to McKinney.

Throughout 1976 and early 1977, McKinney and Gannett worked in apparent harmony. This relationship deteriorated rapidly during the latter part of 1977 and early 1978 with the implementation of Gannett's profit oriented policies, personnel changes, and repeated disregard of McKinney's editorial autonomy.

On September 3, 1978, McKinney filed suit against Gannett and The New Mexican. Within his complaint, McKinney alleged breaches of contract and fraud. McKinney sought compensatory damages of $10,000,000.00, punitive damages of $10,000,000.00, and restoration of his ownership and control of the newspaper.

Within an amended complaint, McKinney alleged eleven causes of action, including breach of contract, fraud, inducement of breach, and conspiracy. McKinney sought relief of rescission, an accounting, compensatory damages relative to rescission, and punitive damages for fraud or deliberate breach of contract.

Gannett answered, denying any wrongdoing and asserting eight affirmative defenses. The New Mexican answered, denying any wrongdoing and asserting twenty-six affirmative defenses. The New Mexican also filed a counterclaim against McKinney for his alleged breach of the employment contract.

As a result of pretrial motions and rulings made during the course of the trial, the district court limited McKinney's causes of action to breach of contract, and fraud. The district court similarly reduced the defenses of Gannett and The New Mexican to waiver, and legal excuse for the alleged breaches of contract. (The New Mexican's counterclaim was dismissed by the court after all the parties rested.)

Prior to trial, the district court granted McKinney partial summary judgment against The New Mexican, finding that an editorial incident constituted a breach of McKinney's employment contract.

The district court divided the trial into two phases. The first phase dealt with the issues of liability for breach of contract and fraud. It was heard by the jury over a period of fourteen weeks. During a motion hearing which occurred immediately prior to the time McKinney rested his case and during the phase one proceeding, the following colloquy transpired between counsel for McKinney and the court:

> THE COURT: All right, if there was a breach there, insofar as legal damages are concerned, we would be in the nominal damage category there, would we not?
>
> * * * * * *
>
> MR. MARSHALL: ... We do not know at this time of any way of putting a price tag on these, short of speculation.
>
> * * * * * *
>
> For one thing, Mr. McKinney isn't interested in money. He's got lots of money. He's interested in the rights he bargained for.
>
> * * * * * *
>
> THE COURT: I'm trying to sift the problems that we have here so that we can get this litigation into manageable shape.
>
> MR. MARSHALL: We do not think that breach is properly compensable in damages.
>
> THE COURT: So, if there is an injury, you would be relegated to nominal damages, apart from the possibility of rescission.
>
> MR. MARSHALL: I think that's correct Your Honor.

[R., Vol. LV at pp. 102–103].

After the parties had rested and the jury had been instructed, a similar colloquy arose between the court and McKinney's counsel while the court was considering objections and exceptions to instructions:

> THE COURT: Do we have a statement by counsel for the plaintiff in regard to waiver of damages in respect to the claimed breaches which are being submitted to the jury? And in order to assume that we do have it, on the record, would you please state that at this time, Mr. Marshall?
>
> MR. MARSHALL: Yes, Your Honor. The plaintiff waives any right to what has been termed on occasion legal damages arising from the breaches submitted to the jury. That is, putting a price tag on the rights of which he has been deprived. We are not, of course waiving our rights to ancillary damages and punitive damages and any other relief by way of rescission, or any other relief.
>
> THE COURT: All right. Let's proceed....
>
> [R., Vol. LXVII at p. 55].

On June 27, 1980, the jury returned special verdicts finding in favor of McKinney on the five claimed breaches of contract and for Gannett and The New Mexican on the fraud claim.

On June 30, 1980, a hearing was conducted and arguments presented on the appropriateness of rescission. Gannett argued that the contractual breaches as found by the jury, did not effectively destroy the essence of the bargain, that rescission was too drastic a remedy, that rescission would amount to the imposition of a penalty, and that the breaches could be cured in other ways via "a combination of declaratory judgment, of injunctive relief and other equitable means". The New Mexican argued that the breaches were not substantial and that equitable relief aside from rescission would be adequate and proper. McKinney argued that rescission was the only adequate remedy, inasmuch as the original agreement provided that without the employment contract there would not be a sale, and because he wanted to continue running the paper and he "doesn't want, or for that matter really need, additional money".

After the arguments of counsel, the court made oral findings, including: any relief other than rescission would be mere patchwork; rescission is not a remedy which a jury can award or consider; and that rescission must be considered and awarded by the court.

On March 17, 1981, the district court entered a detailed memorandum order. The court found, *inter alia,* that its findings and conclusions coincided with the jury's verdicts and that McKinney was entitled to elect for rescission after an accounting. The court observed, *inter alia:*

> My observation of the Gannett men who appeared and testified in court, consideration of their testimony and the exhibits admitted into evidence, and reflection on the testimony of others regarding the conduct which molded the breaches of the Employment Agreement tell me that these are hard-charging, wilful men who, almost without exception, were fully cognizant of the dimensions of Gannett's obligations and McKinney's rights under the Employment Agreement. But this awareness notwithstanding, some of them, acting together, struck for themselves and the corporation they represented a deliberate course of conduct which wilfully and wrongfully dishonored Gannett's obligations and, bit by bit and day by day, shamelessly destroyed the rights bargained to McKinney.
>
> * * * * * *
>
> I believe that Gannett went into this deal with its eyes wide open. It knew the Employment Agreement would interfere with how it wanted to run The New Mexican. It also knew that McKinney was old and physically infirm. It knew that he would be residing in Virginia. It wanted The New Mexican very badly. Gannett took a gamble. It gambled on McKinney's health continuing to worsen. It gambled on McKinney not meaning

what, during negotiations, he had informed Gannett he must retain, i.e. real authority. McKinney's health improved dramatically at lower altitudes. McKinney, instead of fading away, insisted on exercise of his prerogatives under the contract. Gannett had lost its gamble and it must now act to set McKinney adrift, albeit in violation of the terms of their bargain.

* * * * * *

McKinney filed this lawsuit. Gannett responded by duly calling a meeting of The New Mexican's board. McKinney declined to attend, a previous informal attempt at reconciliation having failed.... At that meeting, the final and ultimate breach of McKinney's Employment Agreement occurred: McKinney's responsibilities (authority) under his contract were suspended pending this litigation. He was left with empty titles and his perquisites. Gannett argued that it was necessary to remove McKinney's authority after he had filed this lawsuit because it would have been destructive to the newspaper to allow McKinney to continue his authority while in an adversarial position with it. This argument assumes it was wrongful for McKinney to sue to enforce his rights under the contract. I do not agree. This lawsuit was a perfectly legitimate way for McKinney to vindicate his rights. Gannett could have responded by fully honoring McKinney's contract. Instead, it escalated its pattern of breaches to the highest level of dishonor.

[R., J. Appendix at pp. 661–662, 674, 675].

In summarizing, the district court further stated:

An accounting in this case will be difficult. But because The New Mexican has kept separate books despite control of its financial structure by Gannett, The New Mexican has not been completely assimilated into the parent. *Cf. Rudman v. Cowles Communications, Inc.,* 30 N.Y.2d 1, 330 N.Y.S.2d 33, 280 N.E.2d 867 (1972) (Rescission not appropriate where assimilation complete). Thus, an accounting will, I trust, be workable.

OPTION TO RESCIND

Instead of ordering rescission outright prior to an accounting, I will order that McKinney may elect to have rescission after the accounting. Rescission cannot be had without a price. The magnitude of the price cannot be firmly established without decisions on each item to be considered in the accounting.

Also, McKinney has expressed concern as to what Gannett might do to *The New Mexican* between the time an order of rescission is entered and the actual rescission effected. This period of time could be substantial.... Giving McKinney the option to rescind after the accounting should act as an effective mechanism for assuring that Gannett will act toward *The New Mexican* in a responsible way.

The date by which McKinney must exercise his option to rescind will be set at sixty (60) days after judgment becomes final.

[R., Jt. Appendix at p. 700].

In accordance with this order, the trial court proceeded to the second phase, that of accounting. The parties stipulated that the accounting would be tried to the court, not the jury [McKinney's opening brief at p. 16], all parties having agreed that the accounting would be so complex that a jury would be of no use for the actual accounting. [Jt. Appendix Vol. II at p. 899].

The final hearing on accounting occurred on June 11, 1981, approximately one year after the jury had returned its verdicts on liability. During the course of this hearing, considerable discussion was had relative to the finality of the order as proposed by the court. Gannett argued that the order as proposed was not final:

THE COURT: Well, excuse me, let me interrupt. That raises the question as to whether it's 60 days from a judgment which is entered in this court or 60 days from the time that a judgment becomes final by either by the judgment not being appealed in this court or after appeal.

MR. McCRORY: I would suggest—

THE COURT: And my thought was that he [McKinney] should have 60 days after all the smoke clears off whether by appeal or otherwise.

* * * * * *

THE COURT: My intention is to give him [McKinney] that option 60 days after the smoke clears completely whether it's appealed by appeal or non-appeal, by the passage of time, so with that in mind how do we go about accomplishing that?

MR. McCRORY: I would respectfully submit, Your Honor, that Your Honor does not have the power to determine that because if you make that determination there never can be an appeal.

THE COURT: I'm going to do everything that I can to draft a judgment which will attempt to effectuate that.

MR. McCRORY: I think that would lie within the equitable power of a court of appeals to give him the 60 days after an appellate judgment, but if you say that the final action is not going to come about until 60 days after something then there is no final judgment from which an appeal may be taken.

[R., Vol. LXXIII at pp. 42–43].

McKinney argued, citing to *Irwin v. West End Development Company,* 481 F.2d 34 (10th Cir.1973), *cert. denied,* 414 U.S. 1158, 94 S.Ct. 915, 39 L.Ed.2d 110 (1974), that the proposed judgment was proper and final.

On August 25, 1981 the court entered "Final Judgment" herein. Within that judgment, the court ordered that McKinney could, at his election, opt to rescind the agreement of December 18, 1975, as supplemented, amended and executed on February 27, 1976, detailing the manner in which rescission was to be effectuated. The court specifically enumerated the respective payments incident to rescission, if so elected by McKinney, to be made by one party to the other.

Specifically the judgment provided:

(B) McKinney may exercise the rescission election only during either of the following periods:

(1) The 60-day period commencing the day following expiration of the time to appeal, as determined by the Federal Rules of Civil Procedure, provided that none of the parties to the action has filed a timely notice of appeal; or

(2) The 60-day period commencing on the date of issuance of a mandate of the United States Court of Appeals for the Tenth Circuit affirming McKinney's right to the rescission election.

[R., Jt. Appendix Vol. II at p. 911].

The judgment further provided:

V. In the event that McKinney does not exercise the rescission election or is unable to comply with all the provisions of this Judgment in regard to rescission, all the agreements of the parties shall remain in full force and effect.

[R., Jt. Appendix Vol. II at p. 914].

McKinney, Gannett and The New Mexican have each appealed to this court, raising, cumulatively, nineteen allegations of error. None of the parties, however, raise or address the issue which we deem dispositive, the lack of a final judgment.

The jurisdiction of an appellate court may, of course, be assessed at any stage of the proceedings. In *United States v. Siviglia,* 686 F.2d 832 (10th Cir.1981) we stated:

Notwithstanding the fact that neither party has raised the issue of this court's jurisdiction to hear this consolidated appeal, jurisdictional questions are of primary consideration and can be raised at any time by courts on their own motion. *McGrath v. Kristensen,* 340 U.S. 162, 71 S.Ct. 224, 95 L.Ed. 173 (1950); *First State Bank, etc. v. Sand Springs State Bank,* 528 F.2d 350 (10th Cir.1976); *Bledsoe v. Wirtz,* 384 F.2d 767 (10th Cir.1967). Lack of jurisdiction cannot be waived and jurisdiction cannot be conferred upon a federal court by consent, inaction or stipulation. *California v. LaRue,* 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972); *Natta v. Hogan,* 392 F.2d 686 (10th Cir.1968). "If the parties do not raise the question of lack of jurisdiction, it is the duty of the

federal court to determine the matter *sua sponte.*" *Basso v. Utah Power and Light Company,* 495 F.2d 906, 909 (10th Cir. 1974). A court lacking jurisdiction cannot render judgment but must dismiss the cause *at any stage* of the proceedings in which it becomes apparent that jurisdiction is lacking. *Mitchell v. Maurer,* 293 U.S. 237, 55 S.Ct. 162, 79 L.Ed. 338 (1934); *Citizens Concerned, etc. v. City and County of Denver,* 628 F.2d 1289 (10th Cir.1980).

686 F.2d at pp. 834–835.

28 U.S.C.A. § 1291 vests our appellate jurisdiction to all final decisions of the district courts except where a direct review may be had in the Supreme Court. In acknowledging the limitations of § 1291 in *United States v. Feeney,* 641 F.2d 821 (10th Cir.1981) we stated:

> Title 28 U.S.C. § 1291 provides for appeal only "from all final decisions of the district courts," except where direct appeal to the Supreme Court is provided. This requirement promotes judicial efficiency and "embodies a strong congressional policy against piecemeal reviews, and against obstructing or impeding an ongoing judicial proceeding by interlocutory appeals." *United States v. Nixon, supra,* 418 U.S. 683 at 690, 94 S.Ct. 3090 at 3098–3099, 41 L.Ed.2d 1039; *United States v. MacDonald,* 435 U.S. 850, 98 S.Ct. 1547, 56 L.Ed.2d 18 (1978)....
>
> 641 F.2d at p. 824.

In *Catlin v. United States,* 324 U.S. 229, 65 S.Ct. 631, 89 L.Ed. 911 (1945) the Court defined a final decision to be:

> A "final decision" generally is one which ends the litigation on the merits and *leaves nothing for the court to do but execute the judgment. St. Louis, I.M. & S.R. Co. v. Southern Express Co.,* 108 U.S. 24, 28, 2 S.Ct. 6, 27 L.Ed. 638 (Emphasis supplied)
>
> 324 U.S. at p. 233, 65 S.Ct. at 633.

*See also: Century Laminating, Ltd. v. Montgomery,* 595 F.2d 563 (10th Cir.1979), *cert. dismissed,* 444 U.S. 987, 100 S.Ct. 516, 62 L.Ed.2d 417 (1979).

In *Curtiss-Wright Corp. v. General Electric Co.,* 446 U.S. 1, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980) the Court, citing to *Sears, Roebuck & Co. v. Mackey,* 351 U.S. 427, 76 S.Ct. 895, 100 L.Ed. 1297 (1956) defined a final judgment as:

> ... [A] "judgment" in the sense that it is a decision upon a cognizable claim for relief, and it must be "final" in the sense that it is "an ultimate disposition of an individual claim...."
>
> 446 U.S. at p. 7, 100 S.Ct. at 1464.

■ The responsibility of deciding whether a judgment is final lies with the courts. In *Century Laminating, Ltd. v. Montgomery, supra,* we observed:

> The rule requiring finality of a judgment or order as a prerequisite to appeal is dependent upon statute. 28 U.S.C. § 1291. Any exceptions must be made by Congress, not by the courts, although to the courts falls the responsibility of deciding whether a judgment or order is final and therefore appealable. It is our duty to resolve that question. *United States v. Grand Jury,* 425 F.2d 327 (5th Cir.1970); *Levin v. Baum,* 513 F.2d 92 (7th Cir.1975).
>
> 595 F.2d at p. 566.

*See also: Glass v. Pfeffer,* 657 F.2d 252 (10th Cir.1981).

■ Judgments which, as here, merely determine liability are not final. In *Liberty Mutual Insurance Co. v. Wetzel,* 424 U.S. 737, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976) the Court held:

> The order, viewed apart from its discussion of Rule 54(b), constitutes a grant of partial summary judgment limited to the issue of petitioner's liability. Such judgments are by their terms interlocutory, see Fed.Rule Civ.Proc. 56(c), and where assessment of damages or awarding of other relief remains to be resolved have never been considered to be "final" within the meaning of 28 U.S.C. § 1291.
>
> 424 U.S. at p. 744, 96 S.Ct. at 1206.

When, only one "branch" of the case, liability, has been fully disposed of, a final judgment is lacking and "none of it [the

case] is ripe for review." *Republic Natural Gas Co. v. Oklahoma,* 334 U.S. 62, 68 S.Ct. 972, 2 L.Ed.2d 1212 (1948), at p. 72, *citing Collins v. Miller,* 252 U.S. 364, 40 S.Ct. 347, 64 L.Ed. 616 (1920).

The necessity of strict adherence to the final judgment rule was well articulated in *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978):

> Moreover, allowing appeals of right from nonfinal orders that turn on the facts of a particular case thrusts appellate courts indiscriminately into the trial process and thus defeats one vital purpose of the final-judgment rule—"that of maintaining the appropriate relationship between the respective courts.... This goal, in the absence of most compelling reasons to the contrary, is very much worth preserving."
> 437 U.S. at p. 476, 98 S.Ct. at 2462.

Applying these standards to the case at hand, we must hold that the "Final Judgment" of August 25, 1981, entered in favor of McKinney, was not final. McKinney's option to rescind, as delineated in the court's "Final Judgment" of August 25, 1981, did not "end the litigation on the merits and leave nothing for the court to do but execute the judgment." *Catlin v. United States, supra.* A jurisdictional defect cannot be cured by means of a rule 54(b) certification. *A.O. Smith Corporation v. Sims Consolidated, Ltd.,* 647 F.2d 118 (10th Cir.1981). Thus, we cannot review the merits at this time. To do so would vitiate a vital purpose of the final judgment rule, *i.e.,* "that of maintaining the appropriate relationship between the respective courts." *Coopers & Lybrand, supra.*

As noted, *supra,* McKinney argued that the judgment of the court, *i.e.* affording him the option to rescind or not to rescind sixty days after the judgment became final, with or without an appeal, was a proper, final judgment. McKinney cited and relied on our decision *Irwin v. West End Development Company, supra. Irwin* is quite distinguishable. It does not apply to the case at bar.

In *Irwin* the district court imposed a constructive trust on stock which a corporate officer (defendant) had surreptitiously acquired from other (plaintiff) shareholders. On appeal, the officer in question challenged the imposition of the constructive trust. He argued that the trust had terminated when the shareholders did not tender payment for the return of the stock within thirty days after the district court judgment became final. We rejected this argument, holding that the shareholders were not required to tender payment for return of the stock until such time as the final judgment became effective. In so doing we held:

> The general rule is that an appeal suspends the time allowed by the judgment for the performance of a condition affecting the substantive rights of the parties, so the party who is to perform the condition has the specified time starting from the time that the appellate court judgment becomes effective to perform the condition. 4 Am.Jur.2d, Appeal & Error, § 363.... Thus the appeal suspended the time for performance by the nurses of tendering payment for the shares of stock available to them through the imposition of the constructive trust on the Taylor stock. They must tender payment only after the judgment from this court becomes effective.
> 481 F.2d at pp. 39–40.

The judgment in *Irwin* was final. It contained no options. The appeal merely suspended the time within which the prevailing plaintiff shareholders were required to tender payment for the return of their shares. Thus, *Irwin* cannot be equated with the instant case. The options afforded McKinney in the district court's judgment vitiated the finality requirement. The judgment could not be executed upon until and unless McKinney elected to rescind.

Under the circumstances with which we are now confronted, were we to opt to address the allegations of error raised herein, we would surely be rendering an advisory opinion, which federal courts are not empowered to issue. *FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978); *Herb v. Pitcairn,*

324 U.S. 117, 65 S.Ct. 459, 89 L.Ed. 789 (1945); *Aetna Life Insurance Co. v. Haworth,* 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937); *Cheyenne-Arapaho Tribes of Oklahoma v. State of Oklahoma, et al.,* 681 F.2d 705 (10th Cir.1982). By the terms of the "Final Judgment" McKinney still has the option to rescind or not rescind. Thus, a final judgment has not been entered by the district court. An appellate opinion at this juncture would be advisory only. McKinney, we observe, did elect to rescind following the liability stage of the proceeding. Following the accounting and the trial court's determinations relative thereto, it was incumbent upon the trial court to enter a final judgment delineating the specific bases of its rescission remedies which would be final and conclusive, subject only to appellate review. This the trial court failed to do. Inasmuch as the trial court's judgment is dependent upon McKinney's right to elect, our review is of a hypothetical character. We cannot render advisory opinions. In *Norvell v. Sangre de Cristo Development Co., Inc.,* 519 F.2d 370 (10th Cir.1975), we stated:

> It is fundamental that federal courts do not render advisory opinions and that they are limited to deciding issues in actual cases and controversies. U.S. Const. art. 3, § 1 et seq.; *Barr v. Matteo,* 355 U.S. 171, 78 S.Ct. 204, 2 L.Ed.2d 179 (1957); *Oklahoma City, Oklahoma v. Dulick,* 318 F.2d 830 (10th Cir.1963). A justiciable controversy is distinguished from a difference or dispute of a hypothetical character or from one that is academic. The controversy must be one admitting to specific relief through a decree of a conclusive character, subject to judicial review. *Golden v. Zwickler,* 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969); *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Judicial restraint should be exercised to avoid rendition of an advisory opinion. *Detroit Edison Company v. East China Township School District No. 3,* 378 F.2d 225 (6th Cir.1967), cert. denied, 389 U.S. 932, 88 S.Ct. 296, 19 L.Ed.2d 284 (1967).

519 F.2d at p. 375. *See also: Matter of King Resources Co.,* 651 F.2d 1326 (10th Cir.1980).

The trial court's "Final Judgment" did, to be sure, adjudicate all of the claims or the rights and liabilities of all the parties, and, in that sense terminate the action. *See Golden Villa Spa, Inc. v. Health Industries, Inc.,* 549 F.2d 1363 (10th Cir.1977). However, this adjudication, involving the full array of rescission based accounting-performance remedies is the genesis of the appeal *by each of the parties.*

A brief recital of the various contentions of trial court error should, we believe, demonstrate that McKinney's "second" election to rescind would, in fact, be from our appellate determination of each allegation of error. McKinney contends that the trial court erred in: denying him a jury trial on his claim for damages; requiring him to repay $497,666.00 dividends which he did not receive; allowing Gannett to deduct income taxes of $1,712,777.00 in calculating interest and by denying him the right to deduct his income taxes for the same purpose; structuring rescission payments which exposed him to huge tax liabilities in excess of $2,000,000.00. Gannett contends, *inter alia:* McKinney's employment contract was not breached; McKinney waived his right to rescind; the employment contract and the reorganization agreement were separate, independent contracts; the trial court erred in disregarding its separate identities; rescission should not be granted; McKinney is not entitled to damages ancillary to rescission or to a jury trial on that issue; it was error to order Gannett to repay income taxes it paid on behalf of The New Mexican in that this fails to achieve the goals of restitution; and it was erroneous to order the return of the Taos newspaper to McKinney as part of the rescission and restitution remedy. The New Mexican contends that evidence of McKinney's breaches of his employment contract precluded a directed verdict in favor of McKinney on its counterclaim against him; and, further, that the court erred in assessing discovery sanctions jointly and severally against it and Gannett.

Accordingly, the trial court's judgment, affording McKinney a *second* right or option to rescind, *following our opinion* on the merits of these various conflicting claims of trial court error, renders any such opinion advisory in nature. McKinney could simply measure the extent of his appellate success against his appellate loss in reaching his decision on rescission. Thus, McKinney's determination would not be premised on the trial court's adjudication; rather, it would be predicated on the outcome of this appeal.

The appeals are severally dismissed and the case is remanded to the district court for further proceedings in the light of this opinion. Each party shall bear his or its own costs in the court of appeals.

BREITENSTEIN, Circuit Judge, concurring.

I concur in Judge Barrett's opinion. *Irwin v. West End Development Company,* 481 F.2d 34 (10th Cir.1973), is not pertinent. That case presented a contract created stock option. In the case at bar McKinney is judicially given the option to accept or reject an appellate decision determining the intricacies of technical accounting procedures involving his and Gannett's disputes over substantial sums. Speaking generally the issues, hotly contested on this appeal, relate to taxes, interest, and dividends.

The trial court gave McKinney 60 days after a final appellate decision to choose between rescission and contract performance. He should be required to make that choice before seeking appellate review. Otherwise the appellate decision will be nothing more than advice as to what his position will be under the two alternatives given to him. The grant of advice is not within the judicial function. District court action which permits such choice after appellate decision is not a final reviewable judgment under 28 U.S.C. § 1291.

LOGAN, Circuit Judge, dissenting:

I understand the majority's reluctance to render an opinion on the merits of the instant controversy, when the appellant appears to retain an alternative to accepting the rulings of this Court. But upon close analysis, I think the trial court's ruling is not subject to the infirmities that have led courts to decline review on grounds that the order was not final or that an appellate disposition would constitute an advisory opinion.

McKinney initially sought damages for breach of contract and fraud as well as restoration of his ownership of the newspaper. After the evidence had been presented in the liability phase of the trial and the jury had been instructed, McKinney elected rescission, but he also claimed the right to ancillary damages for the diminution in value he alleged the newspaper suffered under Gannett's management.[1] The option granted by the trial court's judgment has its genesis in two rulings: first, the court's determination that McKinney was not entitled to damages for any diminution in value of the newspaper traceable to Gannett's management policies, a ruling McKinney contests in this appeal; and second, McKinney's expressed concern about what appellees might do to the newspaper between the time of the court's order of rescission and the execution of that order. The trial court, exercising equity jurisdiction, sought to assure appellees' responsible action toward the newspaper by granting McKinney an option to elect rescission after the accounting. The accounting phase of the trial took another year to complete, and after the colloquy described in the majority opinion, the court extended the option until sixty days after the appellate judgment, if there was an appeal.

It is significant that McKinney has dropped all claims for relief except his right to rescission. The option the trial court has given him is simply to take back his stock in the newspaper corporation and surrender

1. McKinney also claims on appeal that the trial court made additional errors in the accounting phase of the trial.

the shares of Gannett stock he acquired in the exchange, with accounting adjustments from both sides,[2] or, alternatively, he can in effect drop his lawsuit and keep the Gannett stock he originally received, without compensation for the breaches of contract or any monetary exchanges. Although I have never seen an equitable judgment framed in the terms now before us, its novelty does not render it invalid. Courts exercising equity jurisdiction are given broad discretion to frame their decrees to do equity. The trial court found that the appellees had acted in bad faith toward McKinney, that they would remain in control of the newspaper until the litigation was completed, and that the option would be an effective mechanism to assure that they would act responsibly toward the property to be returned to McKinney under the court's order. In effect the court determined that considerations of equity justified the alternative nature of the relief. This order seems to me to be within the trial court's powers.

As the majority notes, a judgment is final if it leaves nothing for the court to do except execute judgment and if it informs the losing party of the extent of the remedy afforded against him. *Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945); *Glass v. Pfeffer,* 657 F.2d 252, 254 (10th Cir.1981).

> "[I]f nothing more than a ministerial act remains to be done, such as the entry of a judgment on a mandate, the decree is regarded as final and is immediately reviewable."

*Republic Natural Gas Co. v. Oklahoma,* 334 U.S. 62, 68, 68 S.Ct. 972, 976, 92 L.Ed. 1212 (1948).

Here, unless we reverse or modify the trial court's decision, nothing is left for that court to do except the ministerial acts of recording McKinney's exercise of his option, and, if he chooses rescission, supervising the asset transfers it has already determined and ordered. The losing parties are informed of the remedy afforded against them.

The trial court's order in this case is very similar to the order issued by the district court in *Irwin v. West End Development Co.,* 342 F.Supp. 687 (D.Colo.1972), *aff'd,* 481 F.2d 34 (10th Cir.1973), *cert. denied,* 414 U.S. 1158, 94 S.Ct. 915, 39 L.Ed.2d 110 (1974). In *Irwin,* the plaintiffs sued to enforce a stock purchase option granted them in the articles of incorporation. The district court held that the defendant was obligated to offer the stock to the plaintiffs. The court's judgment gave the plaintiffs thirty days from the date the judgment became final to tender the money for the shares. The defendant appealed the decision and urged that the right to tender payment had expired because the thirty days had lapsed. This Court rejected the defendant's argument and held that the plaintiff had thirty days from the date the appellate judgment became final because the appeal had suspended the running of the thirty days. *Id.* at 39–40. In its disposition of *Irwin,* the Court did not focus on finality. This is not surprising, however, because the order was not significantly different from orders routinely entered in constructive trust cases and judgments granting optional relief to members of a class.

The majority apparently assumes that in *Irwin* the plaintiffs were required to tender their payment as soon as the appellate judgment was final. That is not so. The district court, in impressing the trust on the shares, stated:

> "[T]he trust so impressed being conditioned upon the tender by plaintiffs Irwin and Lease of $4,662.75 each, and by plaintiffs Crowley and McCaleb of $3,496.00 each, all tenders to be plus interest at the rate of 6% per annum from September 9, 1965, to the date of tender. Such tender shall be made within thirty days from the date this judgment becomes final, and, if such tender be not made, the trust hereby impressed shall be released."

2. The accounting adjustments, disputed in these appeals, involve large amounts of money; but I do not believe that affects the finality of the trial court's judgment or bears on whether it is an advisory opinion.

Judgment and Decree 1–2, *Irwin v. West End Development Co.,* 342 F.Supp. 687 (D.Colo.1972). It is clear then, that the plaintiffs had the option to purchase or to not purchase the shares. Here McKinney has the option to tender the shares, plus other items, or not to make the tender. In *Irwin* the option to tender was to expire thirty days after the appellate judgment became final; here, McKinney's option is to expire after sixty days.

A characterization of the judgment as final furthers the policies underlying the finality requirement. These policies are: (1) to avoid interference with trial proceedings, (2) to avoid cost and burden to litigants caused by piecemeal appeals, and (3) to promote efficient judicial administration. *Firestone Tire & Rubber Co. v. Risjord,* 449 U.S. 368, 374, 101 S.Ct. 669, 673, 66 L.Ed.2d 571 (1981). These policies militate in favor of characterizing the lower court's judgment as final. Entertaining the appeal will not interrupt the proceedings below. Refusing to take the appeal will not reduce litigant cost, but rather will likely increase it, particularly if McKinney seeks a 28 U.S.C. § 1292(b) certification with respect to the availability of ancillary damages and the accounting questions that constitute its appeal before us.[3] Taking the appeal now will save time and avoid complications; it will promote judicial efficiency.

Furthermore, the Supreme Court has repeatedly stated that finality is to be given a practical rather than a technical construction. *Eisen v. Carlisle & Jacqueline,* 417 U.S. 156, 171, 94 S.Ct. 2140, 2149, 40 L.Ed.2d 732 (1974); *Gillespie v. United States Steel Corp.,* 379 U.S. 148, 152, 85 S.Ct. 308, 310, 13 L.Ed.2d 199 (1964); *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949). In view of the policies underlying the finality requirement, I think the instant order qualifies as a final judgment.

Because McKinney retains the option to forgo rescission, the majority concludes that a disposition by this Court on the merits would be tantamount to issuing an advisory opinion. I do not agree. The term "advisory opinion" is generally used to describe an action that is not constitutionally justiciable because the parties are not adverse or do not have a significant stake in the controversy, 13 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* §§ 3529–30 (1975), because the issues are not ripe for determination, *Laird v. Tatum,* 408 U.S. 1, 13–14, 92 S.Ct. 2318, 2325–2326, 33 L.Ed.2d 154 (1972), or because the controversy has become moot, *North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971). Here the parties are clearly adverse to each other and have a significant stake in the controversy. The majority's conclusion that a disposition on the merits would constitute an advisory opinion seems to derive from a view that the legal issues are not yet ripe for review because McKinney is not irrevocably committed to rescission.[4] However, the equivocal nature of the judgment below does not implicate ripeness concerns.

The determination whether an issue is ripe for review involves weighing "the appropriateness of the issues for decision by this Court and the actual hardship to the litigants of denying them the relief

3. Such a certification is likely to be sought because resolution of the questions now before us may vary the value of rescission by millions of dollars. Therefore, the logical step in the current posture of the case is for McKinney to seek an order under 28 U.S.C. § 1292(b) to have us review the controlling questions of law raised in his appeal before making the final choice to drop his suit as an alternative to taking back the newspaper with whatever cash adjustments or damage entitlements we determine accompany rescission.

4. If McKinney should opt to forgo rescission, arguably the opinion we render would have no impact on the rights of the parties, thus "mooting" the case. The possibility that rulings will become "moot" in this sense always exists, because the parties may settle the dispute after judgment. This possibility does not render the case moot in the jurisdictional sense. *Cf. Robinson v. California,* 371 U.S. 905, 83 S.Ct. 202, 9 L.Ed.2d 166 (1962) (Supreme Court refused to vacate its decision reversing a criminal conviction despite learning that the defendant had died prior to the Court's disposition of his appeal).

sought." *Poe v. Ullman,* 367 U.S. 497, 509, 81 S.Ct. 1752, 1759, 6 L.Ed.2d 989 (1961). *Accord Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). In private litigation, whether an issue is appropriate for decision turns on whether the factual background has been adequately developed and the legal issues sufficiently crystalized. *See Communist Party of the United States v. Subversive Activities Control Board,* 367 U.S. 1, 78, 81 S.Ct. 1357, 1400, 6 L.Ed.2d 625 (1961); 13 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 3532, at 239–42 (1975). Here, the legal issues were fully developed and decided by the trial court; they have been briefed and argued in this Court on appeal. The trial record comprises 71 volumes. Furthermore, delaying review imposes considerable hardship upon the parties. Under *Poe* and *Abbott Laboratories,* this case is ripe for review.

The Court's reluctance to proceed to the merits is caused by the existence of a contingency—the possibility that McKinney may elect to forgo rescission. This contingency was created by the trial court's exercise of equity powers for the purpose of forcing the appellees to act responsibly toward the newspaper they control during the pendency of the litigation. The appeal will resolve several issues that may affect whether the contingency is exercised, but the contingency does not call for an exercise of the lower court's discretion at any future date.

If we hold that an opinion by us would be advisory because McKinney may choose to forgo rescission after we have ruled on the merits of the appeal, then by the same reasoning McKinney could not seek review of the questions before us under 28 U.S.C. § 1292(b); that determination likewise would be advisory. All section 1292(b) dispositions would suffer from the same infirmity—the disposition may cause one or both parties to abandon the litigation. I cannot accept the view that because litigants may abandon rights reduced to judgment the judgment is advisory.

I would find that the judgment below is final and that our decision on the merits would not constitute an advisory opinion. I would proceed to determine the merits of the issues raised by the parties to the appeal.