671 P.2d 40

W.V. HARLOW, Jr., John G. O'Brien, Wales H. Madden, Jr., John M. Adams, and Adams and McGahey, a General Partnership, Individually and as members of a joint venture known as North Bloomington Pipeline Project, Plaintiffs-Appellants,

v.

The FIBRON CORPORATION, Kinetics, Inc., Midwest Equipment Co., Mid-Tex Construction Co., and James W. Brock, Defendants-Appellees.

No. 5997.

Court of Appeals of New Mexico.

Sept. 22, 1983.

Certiorari Denied Oct. 20, 1983.

Richard E. Olson, Paul M. Bohannon, David L. Spoede, Hinkle, Cox, Eaton, Coffield & Hensley, Roswell, for plaintiffs-appellants.

R.D. Mann, Bob F. Turner, William P. Lynch, Atwood, Malone, Mann & Cooter, P.A., Roswell, for defendants-appellees.

## OPINION

WOOD, Judge.

Harlow (Harlow and the other plaintiffs) purchased defective pipe from Kinetics (Kinetics, Inc., a New Mexico corporation); Harlow obtained a damage judgment against Kinetics. This appeal involves Harlow's efforts to collect that judgment from Midwest (Midwest Equipment Company, a Texas corporation), from Mid-Tex (Mid-Tex Construction Company, also a Texas corporation), and Brock, individually. Harlow sought (A) to hold Midwest, Mid-Tex and Brock liable to pay the Harlow judgment by piercing the corporate veil, and (B) to hold Brock liable to pay the Harlow judgment on the basis of Brock's alleged fraud. The trial court ruled against Harlow on both

contentions; Harlow appeals. We state (1) the background, and discuss (2) piercing the corporate veil, and (3) proof of fraud.

*Background*

In September of 1972, James Brock incorporated Kinetics for the purpose of market- ·ing and manufacturing fiberglass pipe in its plant in Artesia, New Mexico. Brock was a controlling shareholder in Midwest and Mid-Tex. Midwest was in the business of furnishing oil field roustabout services, and Mid-Tex was engaged in operating heavy equipment and dirt moving. Other than the transfer of funds, discussed later, the three companies were not related and did not have common customers. Brock was, however, on the board of directors of all three corporations.

Along with Brock, the shareholders in Kinetics were Messrs. Connie Hester and Robert Evans. Twenty-five thousand shares of $1 par value stock were issued. Additional start-up money was procured by a $56,000.00 SBA loan for which Brock was personally liable. Fiberglass pipe production commenced, and continued for approximately three years, at which time the company began experiencing serious financial difficulties.

The operating expenses of Kinetics were initially financed by the First National Bank in Midland, Texas. By late 1975 or early 1976, the Midland Bank ceased financing Kinetics. Inventories swelled and production ceased. The undisputed evidence is that from this point on, Midwest, Mid-Tex, and Brock, personally, began channeling large sums of money into Kinetics to help Kinetics pay its creditors. Since Brock was president of all three businesses, and they all shared a common accountant, the initial transfers were apparently carried out on a casual basis. Only later did Kinetics issue promissory notes evidencing its indebtedness to Midwest and Mid-Tex. This was done primarily to facilitate bad debt write-offs and was not contemporaneous with the transfer of the funds.

Eventually all of Kinetics' accounts were carried on the Midwest and Mid-Tex books. All financial transactions of Kinetics were carried out through the Texas offices of Midwest and Mid-Tex. The two Texas companies paid virtually all of Kinetics' debts, from rental and utility payments to carrying Kinetics' employees on their own bankroll.

Kinetics began delivery of pipe to Harlow in late 1973 or early 1974. In July of 1978, Harlow obtained a judgment against Kinetics in an Oklahoma state court for damages resulting from the marketing and manufacture by Kinetics of defective pipe. Harlow then filed suit in the United States District Court for the Western District of Oklahoma, seeking full faith and credit on the Oklahoma judgment. Default judgment was entered against Kinetics in the federal court in November 1978 in the amount of $327,885.81. This judgment was subsequently registered in the United States District Court for the District of New Mexico.

In December of 1978, unbeknownst to Harlow, the entire assets of Kinetics were sold to the Fibron Corporation. It is undisputed that Fibron was not made aware of the existence of the Harlow judgment prior to closing this sale. In June of 1979, Harlow filed suit in the District Court of Eddy County seeking judgment against Fibron for violation of our bulk transfers provisions. *See* NMSA 1978, §§ 55–6–101 to 55–6–110. It is undisputed that there was noncompliance with these provisions. A fire subsequently destroyed the entire assets of Fibron, including those purchased from Kinetics. Harlow, by amendment, joined Brock, Midwest and Mid-Tex as defendants, and asserted claims to pierce the corporate veil and in fraud against Brock. Summary judgment was entered against Fibron in June of 1981, and at the same time the sale of Kinetics to Fibron was set aside as violative of the bulk transfers provisions.

*Piercing the Corporate Veil*

A. *Requirements*

Harlow claims that Midwest, Mid-Tex and Brock are alter egos of Kinetics and should be liable for the judgment owed by Kinetics. Inasmuch as this is an incomplete

statement of the requisites for piercing the corporate veil, we state those requisites.

New Mexico decisions have repeatedly held that piercing is an equitable remedy. *Shillinglaw v. Owen Shillinglaw Fuel Company,* 70 N.M. 65, 370 P.2d 502 (1962); *London v. Bruskas,* 64 N.M. 73, 324 P.2d 424 (1958); *State Trust & Savings Bank v. Hermosa Land & Cattle Co.,* 30 N.M. 566, 240 P. 469 (1925).

There are three requisites for obtaining this equitable relief. C. Krendl and J. Krendl, *Piercing the Corporate Veil: Focusing The Inquiry,* 55 Denver L.J. 1 (1978). Krendl and Krendl, at page 15, identify those requisites as instrumentality, improper purpose and proximate causation.

The "instrumentality" requisite is described by Krendl and Krendl:

> [A] plaintiff must prove that the subsidiary or other subservient corporation was operated not in a legitimate fashion to serve the valid goals and purposes of that corporation but that it functioned under the domination and control and for the purposes of some dominant party.

*Id.* at 16. New Mexico decisions refer to the "instrumentality" or "domination" requisite as the alter ego doctrine. *Cruttenden v. Mantura,* 97 N.M. 432, 640 P.2d 932 (1982); *Scott Graphics, Inc. v. Mahaney,* 89 N.M. 208, 549 P.2d 623 (Ct.App.1976). We use the term "alter ego doctrine" hereinafter.

Krendl and Krendl state: "The heart of most corporate veil cases, explicitly or implicitly, is that a corporation has been used for such an improper purpose that equity will permit its corporate form to be disregarded." *Id.* at 28. Krendl and Krendl go on to classify five situations in which improper activities arise. Because of the broadness of these classifications, and the extent of their explanation, these classifications are not helpful in this case. *See* Krendl and Krendl, pages 28–42. Although not specifically identified as a requisite, *Scott Graphics* recognized the "improper purpose" requisite in its discussion of the facts.

It is unnecessary to elaborate on the proximate causation requisite in this case.

### B. *Alter Ego Doctrine*

*Cruttenden v. Mantura* sets forth guidelines for determining if the alter ego doctrine is applicable. *See also* Krendl and Krendl, pages 16–17. Harlow reviews the guidelines against his view of the facts and asserts that the alter ego doctrine applies and, therefore, the veil should be pierced. A substantial portion of the briefs is devoted to applying the "facts" to the *Cruttenden* guidelines. This argument also includes an attack on the trial court's findings as being unsupported by evidence, as being improper statements of law and as being legal conclusions. We need not review the evidence and findings directed to the alter ego doctrine because Harlow's argument is that if the alter ego doctrine applies, then the veil should be pierced. The argument is incorrect.

Krendl and Krendl state:

> If it is found that the subsidiary has been a mere instrumentality with respect to a particular transaction, the next question * * * is whether the parent's domination or control has been used for fraud or other improper purpose. * * * Therefore, in fairness to the parent and to support the policy of limited liability [of corporations], improper purpose must be established before the parent or other dominant party can be found liable.

*Id.* at 18.

Requiring an improper purpose is not inconsistent with *Cruttenden v. Mantura; Cruttenden* ruled the alter ego doctrine was not applicable, it did not reach the question of improper purpose. However, an improper purpose is necessary. *See Scott Graphics.*

Assuming, but not deciding, that the alter ego doctrine is applicable to the facts of this case, the dispositive question is whether the three defendants used Kinetics for an improper purpose.

## C. *Improper Purpose*

■ The trial court found:

Plaintiffs' inability to collect their judgment against Kinetics * * * was not the result of any improper, inequitable, unfair, illegal, unjust or fraudulent act or actions on the part of Defendants Brock, individually, Midwest or Mid-Tex.

This finding is supported by substantial evidence. The three defendants advanced over $1,000,000.00 to Kinetics, or on Kinetics' behalf. This money was not used to further the affairs of the defendants, but to keep Kinetics operating and to pay creditors of Kinetics, including the Midland Bank. The three defendants were supplying money to a losing business, not taking money or other assets from Kinetics. Brock testified that money was put into Kinetics because "I had [a] real good feeling * * * about Kinetics making it."

*Hill v. Dearmin,* 44 Colo.App. 123, 609 P.2d 127, 128 (1980), states:

It would frustrate the purposes of the corporate law to expose directors, officers, and shareholders to personal liability for the obligations of a corporation when they, in their individual capacities, contribute funds to, or on behalf of, a corporation for the purpose of assisting the corporation to meet its financial obligations, and not for the purposes of perpetrating a fraud or promoting their personal affairs.

## D. *Specific Arguments of Harlow*

Harlow contends that the trial court's finding of no improper purpose is inconsistent with other findings or inconsistent with undisputed evidence, and that it would be improper to decide the piercing issue on the basis of the finding quoted in C, above. In this section, we identify and answer the specific arguments.

■ 1. Brock was responsible for the incorporation of Kinetics and Kinetics was undercapitalized, starting off with an indebtedness of $100,000.00. Harlow asserted at oral argument that the undercapitalization, in itself, requires us to hold there was an improper purpose. Undercapitalization is a factor to be considered in determining whether the alter ego doctrine applies, *see Cruttenden v. Mantura,* and is also a factor to be considered in determining whether there was an improper purpose, *see* Krendl and Krendl, page 37. However, it is only one factor to be considered. *See Associated Vendors, Inc. v. Oakland Meat Co.,* 26 Cal. Rptr. 806, 210 Cal.App.2d 825 (1962). Here there was evidence of a legitimate business purpose, separate from the business of the three defendants. There was evidence of the operation of Kinetics as an independent business manufacturing and selling pipe without financial participation from the three defendants until the Midland Bank refused further financing, and evidence that the three defendants undertook their financial assistance with the view that Kinetics would eventually "make it". Under the evidence, undercapitalization does not require us to hold there was an improper purpose or that equity requires imposition of liability on the three defendants.

■ 2. The trial court found that at the time Harlow obtained his judgment in Oklahoma in 1978, the judgment was uncollectable. The trial court found that the lien of the Midland Bank on equipment and inventory was greater than the market value of the assets, equipment and inventory of Kinetics. Harlow contends this finding is incorrect because of the sales price in December 1978, when Kinetics was sold to Fibron. Harlow relies on evidence that Kinetics owed the bank $580,000.00 at the time of the sale, and that Fibron valued Kinetics' assets at $650,000.00. This argument disregards evidence that the value of Kinetics was less than what Fibron paid, that more could be obtained for Kinetics as a going business. According to Brock, if the Bank had foreclosed and there was a forced sale, "[n]o one wants fiberglass wrapping machines and hand tools, that nature. And you'd have just probably had to sell it for junk scrap." The finding is supported by substantial evidence.

■ 3. The sale of Kinetics' assets to Fibron was without notice to Harlow and

was in violation of our bulk sales provisions. Harlow argues that the sale, without notice to Harlow, was the equivalent of commercial fraud. The trial court allowed Harlow full rights of execution against the assets transferred to Fibron. Harlow argues this right of execution did not negate the asserted fraud because of the delay from protracted litigation. The answer is that the value of the assets, inventory and equipment was enhanced after the sale. In addition, Harlow's position as a creditor was enhanced because the Midland Bank's lien was subordinated in the sale, and after the sale was set aside, Harlow had priority over the Bank's lien. "But for the fire in March, 1981, Plaintiffs would have recovered more from the assets of Kinetics, Inc., than they would have if there had been no agreement to sell to Fibron." Harlow did not recover more because of the fire; it only recovered insurance proceeds. No one contends the fire was arson. In light of the findings, which have substantial evidentiary support, a conclusion of fraud upon Harlow is not required.

4. In February 1979, after the sale to Fibron and before the sale was set aside as to Harlow, Kinetics borrowed $90,000.00 from the Midland Bank. Harlow contends that, as a minimum, the three defendants should be liable to Harlow for this amount. The trial court disagreed, finding that the loan was obtained on the basis of Brock's individual credit and was repaid by Mid-Tex. "There was never any assets of Kinetics, Inc. involved in such transaction, and there never was a lien against Kinetics, Inc.'s assets as a result of said loan. Plaintiffs were not in any way damaged by the execution of this note * * *." Substantial evidence supports the finding. This transaction, under the trial court's findings, shows neither an improper purpose nor any injury to Harlow.

5. Harlow contends that the money advanced to Kinetics by the three defendants was improperly considered as loans, and should have been considered capital contributions. Harlow asserts the advances were treated as loans in order for the three

defendants to obtain tax advantages. Thus, Harlow contends the money was advanced for an improper purpose. There is evidence from which the trial court could properly find the advances were in fact loans; any tax advantage resulting from the unpaid loans would thus not show improper purpose.

6. Implicit in all of Harlow's arguments is the view that the trial court should have resolved disputed facts in favor of Harlow and should have pierced the corporate veil, and that this Court should require such a result. This misstates the appellate function; we review for trial court error. The trial court could properly find no improper purpose and could agree with the accountant that there is no benefit "by throwing a million dollars down the drain."

These arguments do not demonstrate that the trial court erred in finding no improper purpose, nor do they require this Court to direct such a result.

*Proof of Fraud*

Brock did not disclose the Harlow judgment to Fibron in connection with the sale of Kinetics' assets to Fibron. Harlow claimed that this nondisclosure was a fraud by Brock on Harlow.

The trial court dismissed the fraud claim against Brock at the close of Harlow's case-in-chief. NMSA 1978, Civ.P.R. 41(b) (Repl. Pamp.1980). The basis of the dismissal was that fraud had not been established by clear and convincing evidence.

We are not concerned here with a false representation by nondisclosure or with the claim of an injury to Harlow by the nondisclosure. Fraud requires a false representation with intent to deceive, and this must be established by clear and convincing evidence. *Sauter v. St. Michael's College,* 70 N.M. 380, 374 P.2d 134 (1962); *Rodriguez v. Horton,* 95 N.M. 356, 622 P.2d 261 (Ct.App.1980).

Brock testified that he did not disclose the Harlow judgment to Fibron because his attorneys told him there was no judgment, that it would be reversed on

appeal. There is evidence that on the day of closing the Fibron sale, both Brock's attorney and the Bank's attorney represented there were no undisclosed judgments, liens or lawsuits that might be claims against the assets of Kinetics. This testimony, if it is to be considered, was sufficient for the trial court to rule that intent to deceive was not established by clear and convincing evidence.

Harlow contends this evidence should not be considered. "Brock surely thinks that the Court is completely credulous if he expects it to believe that he did not know the import of the Oklahoma proceedings."

The credibility of the above-cited testimony was for the trial court; it is not our function to determine the weight to be given this evidence. *Duke City Lumber Company, Inc. v. Terrel,* 88 N.M. 299, 540 P.2d 229 (1975); *Rodriguez v. Horton.* The trial court could properly consider the evidence referred to above.

The judgment of the trial court is affirmed. Plaintiffs are to bear their appellate costs.

IT IS SO ORDERED.

NEAL and BIVINS, JJ., concur.