Robert M. McKINNEY,
Plaintiff-Appellee,

v.

GANNETT CO., INC., and The New Mexican, Inc., Defendants-Appellants.

Nos. 83–1821, 83–1822.

United States Court of Appeals,
Tenth Circuit.

April 29, 1987.

Opinion on Denial of Rehearing and
Rehearing En Banc June 5, 1987.

William S. Brandt, Nixon, Hargrave, Devans & Doyle, Rochester, N.Y. (John B. McCrory was also on the brief), for defendant-appellant Gannett Co., Inc.

Stephen L. Tucker, (Jerry Wertheim was also on the brief) Jones, Gallegos, Snead & Wertheim, Santa Fe, N.M., for defendant-appellant The New Mexican, Inc.

Victor Marshall, Rodey, Dickason, Sloan, Akin & Robb, Albuquerque, N.M., for plaintiff-appellee.

Before HOLLOWAY, Chief Judge, SEYMOUR, Circuit Judge, and BROWN, District Judge.*

* The Honorable Wesley E. Brown of the District of Kansas, sitting by designation.

HOLLOWAY, Chief Judge.

This diversity case arises from a written employment contract to which plaintiff-appellee Robert M. McKinney and defendant-appellant The New Mexican, Inc., were signatory parties. The New Mexican, Inc., is a wholly-owned subsidiary of defendant-appellant Gannett Co., Inc.

After a fourteen week jury trial and related post-trial hearings, a Memorandum Opinion was entered granting McKinney an option to rescind. There followed an appeal to this court, which was dismissed for lack of a final judgment, 694 F.2d 1240 (10th Cir.1982), a remand to the trial court, and more post-trial hearings. There followed a final judgment for the plaintiff ordering a tolling of the employment agreement. The judgment in effect extended McKinney's control over The New Mexican, granted by the employment contract, for a period from Gannett's first breach of contract, as found by the court, until the judgment may be affirmed—a tolling designed to give McKinney a full five-year term as Chairman, Publisher, and Chief Executive Officer and ten years as Editor-in-Chief.

Gannett appeals from that final judgment awarding tolling of the employment contract in No. 83–1822. The New Mexican appeals from dismissal of its counterclaim against McKinney in No. 83–1821.

## I.

### Factual Background

The plaintiff Robert M. McKinney owned The New Mexican, Inc., a New Mexico Corporation which publishes a daily paper in Santa Fe named *The New Mexican.* The plaintiff had been the owner and publisher of the newspaper since 1949. During his ownership of the newspaper, the plaintiff devoted time to various other activities, including serving as a director of Trans World Airlines and as an ambassador under the Kennedy Administration. As owner, the plaintiff employed Steve Watkins as the general manager who handled the day-to-day affairs of the newspaper. The plaintiff maintained a residence in both Santa Fe and New York City.

In 1975, the plaintiff began negotiations with Gannett Co., Inc., for the sale of *The New Mexican.*[1] On December 18, 1975, an "Agreement and Plan of Reorganization" was executed by the plaintiff, his holding company The New Mexican, and Gannett. Pursuant to the agreement, the plaintiff agreed to transfer all of The New Mexican's common stock in exchange for 300,-000 shares of Gannett stock then valued at $11,700,000. The parties agreed, however, not to complete the agreement until several related issues could be resolved and all the documents finalized.

The final agreement was executed on February 27, 1976. Among other things, the agreement included a ten-year employment contract between the plaintiff and The New Mexican.[2] The employment agreement provided that the plaintiff was to remain in charge of the business, operations, news, and editorial policies of the newspaper for the first five years of the contract period, and to remain in charge of the news and editorial policies for the second five years.

The arrangement worked well throughout 1976 and early 1977; however, the relationship between the plaintiff and Gannett deteriorated rapidly during the latter part of 1977 and early 1978. The deteriorating relations culminated in the plaintiff's filing of a lawsuit against Gannett and The New Mexican.

The plaintiff initially sued for breach of contract and fraud. He originally sought compensatory damages of $10,000,000, punitive damages of $10,000,000, and restoration of his ownership and control of the newspaper. In his amended complaint, the plaintiff alleged eleven causes of action, including breach of contract, inducement of breach, and conspiracy, seeking rescission, an accounting, compensatory damages relating to the breach, and punitive damages.

Gannett answered denying any wrongdoing and asserting eight affirmative defenses. The New Mexican answered also denying any wrongdoing and asserting twenty-six affirmative defenses. The New Mexican further filed a counterclaim against the plaintiff for breach of the employment contract.

Pretrial motions and rulings made during the course of trial narrowed the plaintiff's causes of action down to breach of contract and fraud. Gannett's and The New Mexican's defenses were reduced to waiver and

---

**1.** The plaintiff's motive in selling the newspaper appears to be compliance with his physician's request to move to a lower climate for the plaintiff's health.

**2.** The final agreement also included the sale of the *Taos News,* a newspaper also owned by the plaintiff. At his request, the plaintiff was given an oral option to reacquire the *Taos News* after two years, which he did exercise.

legal excuse for the alleged breaches of contract. Prior to trial, the district court granted the plaintiff partial summary judgment against The New Mexican, finding as a matter of law that an editorial incident constituted a material breach of the employment contract. After fourteen weeks of testimony and arguments but before the case was sent to the jury, the court dismissed The New Mexican's counterclaim.

The jury returned special verdicts in favor of the plaintiff on the five claimed breaches of contract and for Gannett and The New Mexican on the fraud claim. Three days later, the court orally concluded that relief other than rescission would be inadequate and that rescission was not a remedy which a jury could award. Thus, the court concluded that rescission must be considered and, if appropriate, awarded by the court. Subsequently the district court found, *inter alia*, that its findings and conclusions coincided with the jury's special verdicts,[3] and that the plaintiff was entitled to elect rescission after an accounting. The court entered its final judgment granting the plaintiff an option at his election to rescind the "Agreement and Plan of Reorganization." All parties appealed. This court dismissed the appeals and remanded the case to the district court. 694 F.2d 1240, 1249. We held that "the trial court's judgment, affording McKinney a *second* right or option to rescind, *following our opinion* on the merits of these various conflicting claims of trial court error, renders any such opinion advisory in nature." *Id.* (emphasis in original). Therefore, the judgment termed a "final judgment" was not final for purposes of appeal. *See id.*, at 1247.

On remand the district court conducted hearings on the appropriate remedy. The court ordered the equitable remedy of "tolling" the running of the employment contract for the period from March 28, 1978, (the date Gannett effectively abrogated the plaintiff's contract rights) to the disposition of this lawsuit.

## II

### The New Mexican's Counterclaim

We first address the dismissal by the district court of The New Mexican's counterclaim against the plaintiff for his alleged breach of the employment contract and of his fiduciary duties as a director and officer. In the district court's oral rulings, The New Mexican's counterclaim was dismissed because The New Mexican presented no evidence on the question of damages proximately caused by any of the breaches alleged in its counterclaim. In its Memorandum Opinion the district court dismissed the counterclaim for three independent reasons. First, in echoing its oral findings the court dismissed the counterclaim for failure of proof of damages. Second, the district court concluded that the allegations in the counterclaim resembled the affirmative defenses asserted in The New Mexican's answer and thus should be submitted and considered as affirmative defenses by Gannett. Related to this finding was the conclusion that "[t]hose allegations in the counterclaim which were not incorporated into an affirmative defense did not have sufficient support in the evidence or were legally insufficient to support a claim." Third, the district court held that "The New Mexican simply failed in its proof of any of the allegations in its counterclaim which might have entitled it to relief of any kind." On appeal, The New Mexican contends that the district court erred in dismissing its counterclaim at the close of the evidence. We disagree.

■ In a diversity case, federal courts are bound by Rule 50, Fed.R.Civ.P., in granting a directed verdict. Under the federal standard "a directed verdict is justified 'only if the proof is all one way or so overwhelmingly preponderant in favor of the movant as to permit no other rational conclusion.'" *Kiner v. Northcutt*, 424 F.2d 222, 223 (10th Cir.1970) (quoting *Fisher Construction Co. v. Fireman's Fund Ins. Co.*, 420 F.2d 271, 275 (10th Cir.1969)). A motion for a directed verdict should be granted cautiously and sparingly. If reasonable men could differ as to the inferences drawn from facts in evidence, a motion for a directed verdict should be denied. *See Hidalgo Properties, Inc. v. Wachovia Mortgage Co.*, 617 F.2d 196, 198 (10th Cir. 1980).

The New Mexican cites three incidents where the plaintiff allegedly breached his employment contract or fiduciary duties. The New Mexican alleges that the plaintiff's *extended absences* from Santa Fe during the period from January 1 to September 1, 1978, detrimentally affected his

---

**3.** The district court treated the jury verdicts as though they had been rendered by an advisory jury. *See* Fed.R.Civ.P. 39(c).

ability to manage the newspaper. The pertinent clause in the employment contract is quite clear:

> It is specifically understood, however, that the Employee shall not be required to devote all of his time, skill or energy to his employment hereunder, but in accordance with his customary past practice shall devote such time and effort to performance of his duties, in such manner, *in such place or places,* and to such extent, *as he may individually and solely determine.*

(I Jt.App. 10–11) (emphasis added). The plaintiff possessed the sole authority under the employment agreement to determine the place or places to perform his duties. In the past, the plaintiff alone decided how much time to devote to the newspaper. Moreover, the record clearly shows that prior to the merger of The New Mexican with Gannett, the plaintiff was often not physically present in Santa Fe. Gannett was fully aware of these absences. (*See, e.g.,* III Jt. App. 946).

Furthermore, the record is void of evidence which would support The New Mexican's contention that the plaintiff's absence detrimentally affected his ability to manage the newspaper. It is true that even with the sole power to decide where to exercise his authority, the plaintiff cannot absent himself from his contractual and fiduciary duties. However, we are not faced with that situation. The plaintiff was absent from Santa Fe, not from his duties to The New Mexican. The record shows that the plaintiff was involved in the affairs of the newspaper. The plaintiff testified that he talked with his general manager often daily and, on occasion, several times a day. (III Jt.App. 1072). The general manager Watkins testified that he routinely sent monthly business reports to the plaintiff, as well as copies of financial statements, significant memoranda, and weekly management meeting minutes. (*Id.* at 1249; IV Jt.App. 1419–21). The plaintiff also received a copy of the newspaper each day. (IV Jt.App. 1419–21).

■ Moreover, the plaintiff was involved in many specific aspects of operating the newspaper. He was actively involved in the employment process. (*See, e.g., id.* at 1470–71). He was involved in the consideration to increase circulation in 1977. (*Id.* at 1443). He requested his general manager to ask Gannett to send an audit team to investigate a circulation problem at the newspaper. (III Jt.App. 1265–66). He also counseled his general manager to modify the ad policy so as not to generate possible restraint of trade concerns. (IV Jt.App. 1498). These are but a sampling of the ways in which the plaintiff continued to manage the affairs of the newspaper. No reasonable jurors could differ as to the inferences drawn from these facts and the other facts in the record.

This is a far cry from the facts in *Bowerman v. Hamner,* 250 U.S. 504, 39 S.Ct. 549, 63 L.Ed. 1113 (1919), a case relied upon by The New Mexican. In *Bowerman,* the director deliberately avoided acquiring knowledge of the business affairs. The Court held that the director breached his common law duty by willfully absenting himself from his duties for years. *Id.* at 510–13, 39 S.Ct. at 551–52.

The second alleged breach of the employment contract by the plaintiff involves his alleged failure to supervise and report about his general manager Watkins to The New Mexican's Board of Directors. Specifically, The New Mexican contends that the plaintiff failed to inform the Board of Directors about the newspaper's circulation problem. The New Mexican further says that the plaintiff, by delegating all of his duties to his general manager, failed to adequately supervise his general manager in the performance of his duties.

The New Mexican relies heavily on *McDonnell v. American Leduc Petroleums, Ltd,* 491 F.2d 380 (2d Cir.1974). Such reliance is misplaced. In *McDonnell,* the defendant-director was an individual with little business experience. *Id.* at 382. At no time did she actively participate in the management of the business. *Id.* She received repeated warnings of mismanagement from a state agency. Rather than investigate these warnings, she accepted assurances that corrections would be made from the object of many of these warnings. *Id.*

The plaintiff's behavior here is not at all similar to the director's behavior in *McDonnell.* Here the plaintiff was actively involved in the newspaper's affairs. Certainly he delegated many of the day-to-day responsibilities to his general manager. Nevertheless the record clearly shows that the plaintiff retained ultimate control over the business and editorial affairs of the newspaper. He took an active role in addressing many of the crises the newspaper faced, such as the circulation problem, the ad problem, and the labor problem.

Further mention must be made concerning what has come to be known as the circulation problem and the labor problem. In 1978 a financial scandal ripened at *The New Mexican* with the discovery that $78,000 worth of circulation accounts receivable had to be written off because the accounts had been manipulated. Both The New Mexican and Gannett point to this problem as proof that the plaintiff had breached his contractual duties by failing to fire Watkins. However it was Gannett that had strongly recommended the hiring of the particular circulation manager who was implicated by the circulation audit and discharged. (IV Jt.App. 1426–27). Moreover, upon learning of possible discrepancies in circulation, the plaintiff immediately ordered Watkins to request an audit team from Gannett.

■ The labor problem at *The New Mexican* centered around the role that Watkins and the managing editor Jameson played. Gannett complains strenuously about the plaintiff McKinney's supervision of Watkins. The newsroom employees at *The New Mexican* voted to unionize. Gannett adamantly opposed unionization. Gannett adopted a strategy with the assignment of different roles to Watkins and Jameson. Watkins was to press the management line with the union, without worry of generating animosity by the newsroom employees. Jameson was to become friendly with the union members and was to distance himself from the negotiations of the union and management on a collective bargaining agreement. (III Jt.App. 1389–92; IV Jt. App. 1435). Thus, Watkins was to wear the "black hat," while Jameson was to don the "white hat." This role played by Watkins was approved by Gannett. Thus it is untenable for Gannett to claim a breach of duty by the plaintiff McKinney because of these actions taken by Watkins in accord with the Gannett plan.

■ The third alleged breach of the employment contract by the plaintiff McKinney involves his attempt to discharge Jameson, the managing editor, and Ryals, the president and new general manager. The New Mexican argues that the plaintiff McKinney's actions were taken without justifiable cause and were contrary to the best interests of the newspaper. However, the

New Mexican's argument does not confront the undisputed evidence that both Jameson and Ryals refused to carry out direct orders from the plaintiff. Jameson refused to modify an editorial and ran it in a form in *The New Mexican* contrary to instructions from plaintiff. The plaintiff then ordered Ryals to fire Jameson for insubordination. The plaintiff was then confronted by outright defiance by Ryals and Jameson, with the backing of The New Mexican and Gannett. The plaintiff was within his rights under the employment contract as to the control of editorial policy and his authority over employees.[4]

### III

### The Alleged Breaches of the Employment Contract

#### A.

Before considering interpretation of the employment contract we must confront a more basic issue. The employment contract was signed by The New Mexican and the plaintiff. Gannett was not a signatory to the contract. Yet it is Gannett that the plaintiff is claiming breached the employment contract.

■ As previously noted, the employment contract was executed at the same time as the Agreement and Plan of Reorganization. The Plan of Reorganization was signed by Gannett. The district court concluded that the employment contract and the Plan of Reorganization were inseparable. (II Jt.App. 660–61, 682). The record amply supports the district court's finding that the employment contract and the Plan of Reorganization are inseparable. Thus, both contracts are to be treated as one.

Furthermore, the district court concluded that the plaintiff could sue Gannett for breaching the employment contract even though it had not signed that contract on the theory that Gannett was essentially the alter ego of The New Mexican. Thus, the district court disregarded the separate corporate status of the parent corporation (Gannett) and its subsidiary (The New Mexican).

■ Generally, the separate corporate status of a parent corporation and its subsidiary will be recognized. This is true

---

**4.** Because we chose to uphold the district court's judgment on The New Mexican's counterclaim on the ground that The New Mexican failed to prove any allegations in its counterclaim, we do

not address the remaining two grounds employed by the district court in reaching its decision.

even where the parent corporation owns all the shares in the subsidiary and the two enterprises share directors and officers as here. *See London v. Bruskas,* 64 N.M. 73, 324 P.2d 424, 427 (1958); *see also* H. Henn & J. Alexander, Laws of Corporations § 148, at 355 (3d ed. 1983). Nevertheless, the district court concluded that in these circumstances equity required it to ignore the separate identity of the two corporations and find that Gannett was the alter ego of The New Mexican. See *London,* 324 P.2d at 427 (1958); *Kutz Canon Oil & Gas Co. v. Harr,* 56 N.M. 358, 244 P.2d 522, 528 (1952).

█ The alter ego theory has been adopted by courts in those cases where the idea of separate corporate status has been used to work an injustice. *See* 1 Fletcher Cyc. Corp. § 41.10, at 397 (perm. ed. 1983) (and cases cited therein). Piercing the corporate veil through the alter ego doctrine is an equitable remedy. *See Southern Union Exploration Co. v. Wynn Exploration Co.,* 95 N.M. 594, 624 P.2d 536, 542 (Ct. App.), *cert. denied,* 95 N.M. 593, 624 P.2d 535 (1981), *cert. denied,* 455 U.S. 920, 102 S.Ct. 1276, 71 L.Ed.2d 461 (1982). One corporation may be the alter ego of another corporation; thus, the two corporations will be treated as one. *Id.* at 398.

The district court relied on numerous facts in disregarding the separate corporate status of the companies. First, Gannett had complete stock ownership of The New Mexican and controlled its board of directors. Second, Gannett itself disregarded their separate corporate status and treated its subsidiaries including The New Mexican as a division of the whole. Third, all of The New Mexican's revenue went to Gannett. Fourth, all of The New Mexican's capital expenditures were approved by Gannett. Fifth, Gannett drafted the employment contract and negotiated with the plaintiff as to the rights and duties of the parties. Finally, Gannett fired Watkins and replaced him with Ryals. (II Jt.App. 687–88).

█ Thus, dominion in this case was virtually complete. Moreover, Gannett's dominion over The New Mexican was used for an improper purpose. *See Harlow v. The Fibron Corp.,* 100 N.M. 379, 671 P.2d 40, 43 (Ct.App.), *cert. denied,* 100 N.M. 439, 671 P.2d 1150 (1983). Gannett's improper purpose was to frustrate the contract rights of the plaintiff as chief executive officer and publisher of *The New Mexican.*

We find no error in the trial court's application of the alter ego doctrine and the result that Gannett was treated as breaching the employment contract.

**B.**

█ Under the applicable state law the question whether a written contract contains an ambiguity is a question of law. *Boatwright v. Howard,* 102 N.M. 262, 694 P.2d 518, 520 (1985). Moreover, construction of an unambiguous contract is also a matter for the court. *Id.* However, construction of an ambiguous contract generates questions of fact which are matters for the trier of fact whose conclusions are subject to the clearly erroneous standard of Fed.R.Civ.P. 52(a). *City of Farmington v. Amoco Gas Co.,* 777 F.2d 554, 560 (10th Cir.1985). The clearly erroneous standard is not only applicable where the findings necessarily rest on the credibility of live testimony, but also where the findings turn on documentary evidence. *See Anderson v. City of Bessemer City,* 470 U.S. 564, 572–73, 105 S.Ct. 1504, 1510–11, 84 L.Ed.2d 518 (1985). Furthermore, the clearly erroneous standard is applicable when the trial judge uses an advisory jury as here. In such a case we review the findings of the trial court and not the advisory jury's verdict. *See Sheila's Shine Products, Inc. v. Sheila Shine, Inc.,* 486 F.2d 114, 122 (5th Cir.1973); 9 C. Wright & A. Miller, Federal Practice & Procedure § 2335, at 127 (1971) (and cases cited therein).

Our analysis begins with the employment contract. Its relevant portions which were allegedly breached are paragraphs 3A, B and C:

3. *Duties of Employee.*

A. Subject to such overall corporate and departmental budget limitations as may be established by the Board of Directors, as Chief Executive Officer and Publisher, the Employee shall be in complete charge of the business and operations of the Company, and shall be responsible to the Board of Directors. He shall be responsible for the news and editorial policies of all publications subject to his direction and shall direct, supervise and oversee all operations of such publications, with complete authority over all employees. The employees of the Company shall be responsible to the Employee, and any policies established by the Board of Directors of the Company pertaining to employees shall be im-

plemented through the Employee. It is specifically understood that the Employee shall be entitled to employ his daughter, Robin McKinney, in such capacities and upon such conditions as he shall determine, provided that Robin McKinney (i) may be employed only in capacities which are within the range of her capabilities and experience, and (ii) may not be paid compensation which would exceed the compensation paid by the Company to other individuals in comparable capacities.

B. Subject only to such news and editorial department budget limitations as may be established by the Publisher of such publications and the Board of Directors, as Editor-in-Chief, the Employee shall be in complete charge of news and editorial policies of all publications presently published by the Company. He shall direct, supervise and oversee all news and editorial operations of such publications with complete authority over all news and editorial employees, subject only to such news and editorial department budgeting limitations as may be established by the Board of Directors of the Company and the Publisher of such publications. It is specifically understood that he shall be entitled to employ his daughter, Robin McKinney, in such news and/or editorial capacities and upon such conditions as he shall determine, provided that Robin McKinney (i) may be employed only in capacities which are within the range of her capabilities and experience, and (ii) may not be paid compensation which would exceed the compensation paid by the Company to other individuals in comparable capacities.

C. In either or both of the foregoing capacities, the Employee shall use his best endeavors to promote the interests of the Company in printing, publishing and circulating the newspapers and other publications presently published by the Company. It is specifically understood, however, that the Employee shall not be required to devote all of his time, skill or energy to his employment hereunder, but in accordance with his customary past practice shall devote such time and effort to the performance of his duties, in such manner, in such place or places, and to such extent, as he may individually and solely determine.

(I Jt. App. 8–11).

5. *See* N.M.Stat.Ann. § 53–11–35(a) (1978).

We agree with the district court that the quoted provisions of the Employment Agreement are clear and unambiguous. (II Jt.App. 662–63).

> They give McKinney, as Editor-in-Chief for 10 years, total control of news and editorial policies of The New Mexican, subject only to budget limitations not here relevant. They give McKinney, as Chief Executive Officer and Publisher for 5 years, complete control of the business and operations of The New Mexican, Inc., subject only to "corporate and departmental budget limitations" not here relevant, except that as Chief Executive Officer and Publisher McKinney was to be "responsible to the Board of Directors."

(*Id.* at 662). In both capacities, the plaintiff had the duty to "use his best endeavors to promote the interests of" The New Mexican. The plaintiff also solely possessed the complete discretion to decide how much time he would devote to the performance of his duties and to decide where to perform them.

At the outset, Gannett argues that the district court's interpretation of the employment contract is erroneous because it gives the plaintiff, as an officer and employee of a New Mexico corporation, greater power and authority than The New Mexican's board of directors. Essentially, Gannett argues that under the district court's interpretation, the board of directors delegated its total authority to run the affairs of the corporation to the plaintiff.

 Although ultimate responsibility for managing a corporation rests with the board of directors,[5] the directors are not required to actively participate in the operation of the business. They may delegate such authority as they deem necessary. *See* 2 Fletcher Cyc. Corp. § 495, at 498 (perm. ed. 1982). Not only may directors delegate authority to transact ordinary and routine business, but also authority to transact business requiring the highest degree of judgment and discretion. *See Jones v. Williams*, 139 Mo. 1, 39 S.W. 486, 490 (1897). *See also* 2 Fletcher Cyc. Corp. § 495, at 498. There is, however, a limit to the delegation of authority. Directors cannot delegate entire supervision and control of the corporation. *See* 2 Fletcher Cyc. Corp. § 495, at 504.

Delegation of managerial authority is permitted by statute in New Mexico. N.M. Stat.Ann. § 53–11–48 (1978) states, in pertinent part:

> All officers and agents of the corporation, as between themselves and the corporation, shall have the authority and perform the duties in the management of the corporation as provided in the bylaws, or as determined by resolution of the board of directors not inconsistent with the bylaws.

The New Mexican's bylaws are consistent with the plaintiff's employment contract. Moreover, the board of directors passed a resolution expressly approving the plaintiff's employment contract. (VI Jt.App. 2606–07 (Plaintiff's Exhibit No. 560)).

 While plaintiff's authority was extensive we are not faced with an attempt by The New Mexican's board of directors to delegate all or substantially all their powers; rather, the board delegated certain specific authority to the plaintiff by contract. The trial court construed the employment agreement as giving the plaintiff authority in the specified areas of personnel and editorial control. We believe this construction is correct. Plaintiff under paragraph 3A of the employment contract was responsible to the Board of Directors and it set corporate and departmental budget limitations, *inter alia*. Thus, the cases cited by Gannett for the proposition that the contract is void are inapplicable. Those cases dealt with situations where there was a total delegation of powers by the board of directors. *E.g., Milton Frank Allen Publications, Inc. v. Georgia Association of Petroleum Retailers, Inc.*, 224 Ga. 518, 162 S.E.2d 724 (1968), *cert. denied*, 393 U.S. 1025, 89 S.Ct. 636, 21 L.Ed.2d 569 (1969) (contract divesting directors of the power to set membership dues which were the association's primary source of revenues held invalid); *Kennerson v. Burbank Amusement Co.*, 120 Cal.App.2d 157, 260 P.2d 823 (1953) (contract delegating the practical control and management of substantially all corporate powers held invalid). This is not the case before us.

6. We do note, however, that New Mexico law states that "[t]he business and affairs of a corporation shall be managed by a board of directors...." N.M.Stat.Ann. § 53–11–35(a) (1978). Thus, although The New Mexican's board of directors possessed the ultimate power

## IV

We now turn to the six alleged breaches of the employment agreement.

### A

### Termination of general manager Watkins without the plaintiff's prior approval

 Gannett concedes in its brief that it terminated general manager Watkins without consulting at all with the plaintiff. The district court found that such conduct, among other things, by Gannett breached the employment agreement with the plaintiff. We agree.

The agreement is unambiguous. The plaintiff McKinney had been delegated the contractual right to hire and fire. Gannett's refusal to consult with the plaintiff in these circumstances was a breach of contract.

The record shows that *Gannett* fired Watkins and then informed the plaintiff of the firing. (III Jt.App. 1083). The plaintiff was not given notice of the Gannett meeting where Watkins was fired. This was all done without any call of a New Mexican board meeting at which McKinney would have been chairman. Moreover the subsequent ratification by The New Mexican board of Watkins's firing does not excuse the firing without any notice to McKinney. We need not decide whether the plaintiff McKinney could have insisted on retaining Watkins even over the objection of The New Mexican's board of directors.[6] We hold only that Gannett's manner of firing of Watkins without any consultation with the plaintiff violated the plaintiff's employment contract.

### B.

### Gannett's hiring of N. Walter Ryals as the general manager of The New Mexican without the plaintiff's prior approval

 The advisory jury and the district court found that Gannett's hiring of N. Walter Ryals as the General Manager of The New Mexican to replace Watkins without consulting with the plaintiff breached the employment contract. We agree. The

and legal obligation to manage the business and affairs of the corporation, by contract it provided the plaintiff certain rights which are consistent with this provision. It is these specific contractual rights which were breached.

employment contract is again unambiguous. Once again, Gannett's failure to consult with the plaintiff violated the employment contract.

## C.

### The June 4, 1978 editorial incident

Another breach of the plaintiff's employment contract concerns the June 1978 gubernatorial primaries in New Mexico. A month prior to the primaries *The New Mexican's* editorial page writer composed a draft editorial endorsing but criticising a candidate for the Democratic nomination. (IV Jt.App. 1605–08). After reviewing the editorial endorsement, the plaintiff ordered the criticism deleted. The editorial page writer refused. (*Id.* at 1609–10). The plaintiff then ordered the managing editor Jameson to change the editorial. Jameson refused and referred the plaintiff to Ryals, the general manager. (III Jt.App. 1101–03). The plaintiff then turned to the new general manager Ryals and ordered him to change the editorial. The plaintiff testified that Ryals refused. (*Id.* at 1103). Ryals, however, testified that he could not remember being directed by the plaintiff to change the editorial. (IV Jt.App. 1568). Ryals did acknowledge that he had a conversation with the plaintiff concerning the editorial. And after having his memory refreshed by the reading of several questions and answers from a previous deposition, Ryals testified that he was directed by the plaintiff to see that the editorial was changed. (*Id.* at 1571). The editorial appeared without the changes the plaintiff had ordered.

The district court granted the plaintiff's pretrial motion for summary judgment on this claim, holding that this incident as a matter of law constituted a breach by Gannett of the plaintiff's employment contract. Relying on a memorandum signed by Ryals and drafted with the aid of Gannett executives which outlined the replacement of the plaintiff's complete editorial authority under the contract by an editorial board of which the plaintiff would be one member (V Jt. App. 1990–91 (Plaintiff's Exhibit No. 228)), the court held that Ryals, with the concurrence of Gannett, "did not intend to honor a clear and important provision of McKinney's contract, one which, at that time, would otherwise be in effect for about seven and one-half years." (II Jt. App. 673).

In sum, the employment contract clearly vested editorial discretion in the plaintiff. Gannett's attempt to minimize the importance of this breach is specious. A refusal to comply with such an essential duty created by the contract cannot be regarded as anything less than a material breach. *See* 4 Corbin on Contracts §§ 946, 956 (1951).

## D

### The plaintiff directed Ryals to fire the managing editor Jameson for Jameson's refusal to carry out the plaintiff's order on the June 4 editorial which Ryals refused to follow

The district court found that "after mature and careful deliberation as well as further consultation with his attorney, [the plaintiff] decided to direct Ryals to fire Barclay Jameson." (II Jt.App. 675). We agree with the district court that the plaintiff was justified in firing Jameson because of his refusal to carry out the plaintiff's orders on the June 4 editorial. After consulting with Gannett, Ryals refused to fire Jameson. Such refusal was a material breach of the employment contract.

## E

### The plaintiff's attempt to fire Ryals for failing to fire Jameson was blocked by Gannett

After Ryals informed the plaintiff that he would not fire Jameson, the plaintiff attempted to fire Ryals for insubordination. The plaintiff named an acting general manager and directed Ryals to publish a news release in *The New Mexican* announcing the action. Gannett thwarted the plaintiff's attempt to fire Ryals, thus breaching the employment contract again.

Gannett argues in its brief that Jameson and Ryals were fired without justifiable cause; that they both were pawns in the scheme by the plaintiff to "test" his rights under the employment contract. The record does not support this contention. Rather, the record clearly shows that these two employees disregarded any attempt by the plaintiff to exercise his rights under the contract. Their failure to carry out direct orders can be characterized as nothing less than gross insubordination. Both Jameson and Ryals, with the blessing of Gannett, refused to carry out specific

orders of their Chief Executive Officer and Editor-in-Chief.

## F

### The New Mexican's Board of Directors suspended the plaintiff's authority under the employment contract

■ The district court found that after the plaintiff filed this suit Gannett called a meeting of The New Mexican's board of directors. The board passed a resolution suspending the plaintiff's authority under the employment contract pending this litigation. The court stated:

Gannett argued that it was necessary to remove McKinney's authority after he had filed this lawsuit because it would have been destructive to the newspaper to allow McKinney to continue his authority while in an adversarial position with it. This argument assumes it was wrongful for McKinney to sue to enforce his rights under the contract. I do not agree. This lawsuit was a perfectly legitimate way for McKinney to vindicate his rights. Gannett could have responded by fully honoring McKinney's contract. Instead, it escalated its pattern of breaches to the highest level of dishonor.

(II Jt. App. 675). We agree with the reasoning and conclusion of the district court.

## V

### The Affirmative Defenses

The affirmative defenses which were considered with respect to the breaches were waiver and failure to use best endeavors on the part of the plaintiff. The trial court concluded that waiver applied only to the first two breaches, the firing of Watkins and the hiring of Ryals. The court further concluded that the failure to use best endeavors applied to the last three breaches—the plaintiff's attempt to fire Jameson and Ryals and the suspension of the plaintiff's authority by The New Mexican's board of directors.[7] The court concluded that neither affirmative defense was proved.

■ Specifically, the court concluded that Gannett failed to prove waiver in these circumstances. After Watkins was terminated by Gannett and Ryals was hired, the

plaintiff introduced Ryals as *The New Mexican's* new general manager at a luncheon attended by Santa Fe businessmen and civic leaders. It seems logical that the plaintiff was attempting to make the best of a bad situation. In introducing Ryals as the new general manager, the plaintiff appears to have considered the best interests of *The New Mexican.* We conclude that the district court did not clearly err in finding that waiver had not been proved.

■ The court further stated that although a question of fact existed as to the affirmative defense of whether the plaintiff failed to use his best endeavors, the advisory jury and the court concluded that the defense had not been established. After a review of the record and the briefs, we conclude that the court's findings on this issue are not clearly erroneous. The record shows that the plaintiff attempted to fire Jameson and Ryals only after they, along with Gannett, thwarted his authority to control editorial policy. After firing Jameson and Ryals, the plaintiff named acting replacements until permanent replacements could be found. We also agree with the district court that Gannett did not have any legal justification for removing the plaintiff's authority because he filed this suit.

## VI

### The Remedy

■ Exercising its equitable powers, the district judge tolled the employment contract from "the period starting March 28, 1978, (the date when Watkins was terminated from employment) and ending on the date judgment becomes final after appeal or otherwise." (VII Jt.App. 2931 (citation omitted)). In *Jicarilla Apache Tribe v. Andrus,* 687 F.2d 1324 (10th Cir.1982), we held that "[a]n appeal to the equity jurisdiction of the federal district courts ... is an appeal to the sound discretion which guides the determinations of courts of equity." *Id.* at 1341 (citations omitted). Thus, application of equitable doctrines rests in the sound discretion of the district court; absent a showing of abuse of discretion, the district court's exercise thereof will not be disturbed on appeal.

"Equity will not suffer a wrong without a remedy." 2 J. Pomeroy, Equity Jurispru-

7. The district court concluded that none of the affirmative defenses alleged by Gannett or The New Mexican applied to the breach involving the editorial incident. We agree with the district court's conclusion on this issue.

dence § 423–424 (5th ed. 1941). This maxim does not end the inquiry but serves as a guide to the existence and exercise of equitable jurisdiction. Its purpose is to signal those instances when exercise of the court's equitable powers may be appropriate. The New Mexico courts have consistently held "that fairness, justice and right dealing is an equity concept that dominates all commercial practices and transactions." *Cornell v. Albuquerque Chemical Co.*, 92 N.M. 121, 126, 584 P.2d 168, 173 (Ct.App. 1978) (citation omitted).

 Gannett argues that the plaintiff did not originally ask for tolling of the employment contract; therefore, the court's grant of such a remedy was an abuse of discretion. Originally, the plaintiff agreed to relinquish his rights, *inter alia*, in the employment agreement if, and only if, he was given back *The New Mexican* together with damages ancillary to rescission. (VII Jt.App. 2928). The district court denied damages ancillary to rescission and concluded that the plaintiff did not waive his rights in the employment contract. We agree. The condition that was to be satisfied *before* the plaintiff waived his rights in the employment contract, *i.e.*, damages ancillary to rescission, was never satisfied.

Gannett also makes an analogous argument based on the doctrine of election of remedies. Gannett argues that because the plaintiff sought rescission of the contract, he cannot now seek tolling of the contract because the two theories are inconsistent.

 In a diversity case, the doctrine of election of remedies is an element of state substantive law which we are bound to apply. *See Estate Counseling Service, Inc. v. Merrill Lynch, Pierce, Fenner & Smith*, 303 F.2d 527, 530 (10th Cir.1962). New Mexico recognizes the doctrine of election of remedies as a defense. *See Three Rivers Land Co. v. Maddoux*, 98 N.M. 690, 652 P.2d 240, 243 (1982), *overruled on other grounds, Universal Life Church v. Coxon*, 105 N.M. 57, 728 P.2d 467, 469 (1986). The purpose of this doctrine is to prevent vexatious and multiple litigation of actions arising out of the same subject matter. *Id.* In *Maddoux*, the Supreme Court of New Mexico announced that as an equitable doctrine, the election

of remedies is controlled by principles of equity, including the principle that courts will invoke equity to serve justice. *Id.*

The doctrine of election rests upon the principle that he who seeks equity must do it, and means, as the term is ordinarily used, that where two inconsistent or alternative rights or claims are presented to the choice of a party, by a person who manifests the clear intention that he should not enjoy both, then he must accept or reject one or the other; and so, in other words, that one cannot take a benefit under an instrument and then repudiate it.

*Id.* (quoting *Peters v. Bain*, 133 U.S. 670, 695, 10 S.Ct. 354, 362, 33 L.Ed. 696 (1890)).

 The Supreme Court of New Mexico has clearly held that since the doctrine of election of remedies is one of equity, the standard of review of the trial court's decision on whether to apply the doctrine is the abuse of discretion standard. *See id.*, 652 P.2d at 243–44. In *Maddoux*, the court considered the conduct of the party asserting the defense to determine whether that party should be allowed to benefit from the application of the doctrine. *Id.* at 244. After reviewing the record and the findings of the district court, we conclude that Gannett's conduct suggests that it should not be permitted to benefit from the application of the doctrine. Therefore, the district court's decision not to apply the doctrine in these circumstances was not an abuse of discretion.

 Gannett further argues that the district court is ordering specific performance of the employment contract under the guise of the remedy of tolling. We disagree. The district judge stated that

it is not ordering specific performance in this case. It is merely declaring the continued existence of the agreement of the parties with an extension thereof. Whether Gannett will or will not choose to comply with its agreement is for it to decide. If its choice is not to abide by its agreement then it will again lie with McKinney to determine his course of action.

(VII Jt. App. 2933). Moreover, the court observed and the plaintiff concedes in his brief on appeal that the tolling order would leave undisturbed the board of directors' power to remove the plaintiff in the future, subject to the provision in N.M.Stat.Ann.

§ 53–11–49 (1978). (VII Jt.App. 2933; Appellee's Brief 44).[8]

The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.

*Hecht Co. v. Bowles,* 321 U.S. 321, 329–30, 64 S.Ct. 587, 591–92, 88 L.Ed. 754 (1944).

 The equitable application of the tolling doctrine is of historic significance and may be an appropriate remedy for one party where the term of a contract has been interrupted by the conduct of the other party. *See Jicarilla Apache Tribe,* 687 F.2d at 1341. This is exactly the case we now have before us. What emerges from the record is that Gannett engaged in a course of conduct with the purpose of frustrating the plaintiff's rights in the employment contract and removing his name from the masthead. (*See e.g.,* Plaintiff's Exhibit No. 14, where Gannett sought a replacement for Watkins 1) "who would be nice to the 'old coot'; 2) would tell him what had been done *after* it had been done; and 3) would keep his office dusted in case he dropped in." (citation omitted); *see also* Jt. App. 667–68 and n. 1). Gannett's attitude toward its contractual obligations is evident in the testimony by Mr. Neuharth, the Chairman and Chief Executive Officer of Gannett, that key provisions in the plaintiff's employment contract were mere "window dressing" to impress family. (III Jt. App. 998–1001). "The power to control its

business does not imply the right to repudiate contracts lawfully entered into." *Jones,* 39 S.W. at 492. A corporation has no more right to repudiate its valid contracts than an individual has.

We are impressed by these observations of the district judge concerning the testimony:

> That which brought on this litigation cannot be ignored. It cannot so blithely be set aside and forgotten. The outstanding and ugly reality is this: It was the perfidy of Gannett's hard chargers that forced this litigation.... This Court cannot, and will not, hand victor's laurels to Gannett in its campaign to get McKinney "off the masthead" in gross violation of obligations freely and solemnly assumed.... This Court's sense of equity is not so jaded. It is not so blind or so insensitive. Gannett's conduct, as revealed in the trial of this case, may be acceptable in its executive suites or in the marketplaces in which it moves and trades. It is not acceptable in this, or any other, court of equity.

(VII Jt. App. 2929).

## VII

 We conclude that the district court did not abuse its discretion in employing the equitable remedy of tolling or in any respect in the judgment and orders entered.

Accordingly both the counterclaim's dismissal appealed in No. 83–1821 and the judgment awarding tolling appealed in No. 83–1822 are

AFFIRMED.

---

**8.** We further note that New Mexico law does not require mutuality of *remedy* for a court to order equitable relief. *See, e.g., Vanzandt v. Heilman,* 54 N.M. 97, 214 P.2d 864 (1950) (specific performance of a contract so ordered). *Vanzandt* was a case involving specific performance of a contract to execute an oil and gas lease. Although we recognize the obvious differences between specific performance of an oil and gas lease and specific performance of an employment contract, we also recognize the similarity; that is, "the mere lack of mutuality of remedy in favor of the defendant[s] is not ground for refusing equitable relief." *Id.,* 214 P.2d at 870; *see also, McCoy v. Alsup,* 94 N.M. 255, 609 P.2d 337, 343–44 (Ct.App.1980).

Such reasoning does not end the inquiry, however. Here we have a willing employee (plaintiff) who attempts only to perform under his employment contract, and no adequate legal remedy. Moreover, we agree with the district court that there is a certain uniqueness which comes with setting the editorial policy of the largest newspaper in the capitol city of a state. In similar circumstances, courts have enjoined employers from *wrongfully* interfering with such employee's performance. *See, e.g., Jones v. Williams,* 139 Mo. 1, 39 S.W. 486 (1897).

Nevertheless, we reiterate that tolling of the employment contract and not specific performance was ordered by the district court. Thus we are confronted with a declaration of contract rights and not a coercive order decreeing enforcement of the employment contract.

## ORDER DENYING REHEARING AND REHEARING EN BANC

Before Honorable WILLIAM J. HOLLO-WAY, Jr., Chief Judge, and Honorable MONROE G. McKAY, Honorable JAMES K. LOGAN, Honorable STEPHANIE K. SEYMOUR, Honorable JOHN P. MOORE, Honorable STEPHEN H. ANDERSON, Honorable DEANELL R. TACHA and Honorable BOBBY R. BALDOCK, Circuit Judges, and Honorable WESLEY E. BROWN, District Judge.

There comes on for consideration the petition for rehearing and suggestion for rehearing en banc filed by defendant-appellant Gannett Co., Inc.

Upon consideration whereof, the judges of the panel to whom the case was argued and submitted, Judge Holloway, Judge Seymour and Judge Brown, deny the petition for rehearing for the following reasons:

Gannett Co., Inc. first argues that this court applied the wrong standard of review, that Gannett was entitled to trial by jury pursuant to Fed.R.Civ.P. 39(c), and that accordingly it was error for this court to review the findings of the district court under the clearly erroneous standard.

Initially the plaintiff-appellee Robert M. McKinney and the defendants-appellants The New Mexican, Inc., and Gannett Co., Inc., all sought damages at law entitling them to a jury trial as of right. II R. 654. McKinney, however, waived his right to a jury trial as well as his claim for legal damages, electing rescission. The New Mexican continued to press its right to a jury trial on its compulsory counterclaim. At the close of all the evidence the district court granted McKinney's motion for a directed verdict on the New Mexican's counterclaim. The case was then submitted to the jury which returned verdicts in favor of McKinney on his breach of contract claims and against McKinney on his fraud claim. In its Memorandum Opinion the district court treated the jury's verdicts as having been rendered by an advisory jury and agreed with and embraced those verdicts in its Memorandum Opinion. *Id.* at 655, 661.

■ The district court concluded that Gannett Co., Inc., was not entitled to a trial by jury as of right. II R. 655. We agree that Gannett Co., Inc., was not entitled to a jury trial pursuant to Fed.R.Civ.P. 38 or the Seventh Amendment to the United States Constitution.

■ The district court did not abuse its discretion by not ordering a jury trial pursuant to Fed.R.Civ.P. 39(c). This provision of the Rule confers discretion on the district court to order a trial with a jury whose verdict would have the same effect as if a trial by jury had been a matter of right "with the consent of both parties." Here the district court did not order a trial by jury pursuant to Rule 39(c) rather, the court in its pre-trial order had ordered a trial by jury as of right. II R. 654. That right dissolved when McKinney elected to pursue rescission and waived damages and the New Mexican's counterclaim was disposed of by a directed verdict in favor of McKinney. Moreover, there was no consent by all the parties for the court to order a jury trial by consent pursuant to Rule 39(c). *See Hargrove v. American Cent. Ins. Co.,* 125 F.2d 225, 228 (10th Cir.1942). McKinney did not consent to trial by jury and even affirmatively waived his right to trial by jury. Thus the reasoning in *Stockton v. Altman,* 432 F.2d 946, 949–50 (5th Cir.1970), *cert. denied,* 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 532 (1971), that consent to trial by jury can be inferred where one party demands a jury trial and the other parties do not object is not applicable here.

The cases cited by Gannett for the proposition that it was entitled to a jury trial pursuant to Rule 39(c) are not persuasive. *Hargrove v. American Cent. Ins. Co.,* 125 F.2d 225 (10th Cir.1942), after reviewing the jury functions and requirements in the federal courts, held that the use of an advisory jury by the district court is limited to cases which are not triable to a jury as of right, and that if the parties waived their right to jury trial in a case thus triable, the court lacks authority to use an advisory jury. *Id.* at 228–29. Here the case was not triable to a jury as of right. Thus the use of the advisory jury was not proscribed by *Hargrove.* The remaining authorities cited by Gannett concern cases where a right to jury trial had been waived and the court was confronted with reinstating the constitutional right under Rule 39(b), *see Paramount Pictures Corp. v.*

*Thompson Theatres,* 621 F.2d 1088, 1090–91 (10th Cir.1980) (no abuse of discretion to deny trial by jury where assumed right thereto was waived), or had reinstated the right on stipulation of the parties, but *sua sponte* reversed its reinstatement order. *See, e.g., AMF Tuboscope, Inc. v. Cunningham,* 352 F.2d 150, 152–53, 155 (10th Cir.1965).

The district court did not abuse its discretion in employing the use of an advisory jury in this case. And since it properly used such a jury, the court's finding are reviewable by us under the clearly erroneous standard, as we have done. *Sheila's Shine Products,* 486 F.2d at 122.

The claimed errors in the instructions given to the jury are harmless in light of the fact that the jury was acting in an advisory capacity in the trial of this action. *See* 9 C. Wright & A. Miller, Federal Practice & Procedure § 2335, at 127 (1971). The remaining issues presented in the petition for rehearing and suggestion for rehearing en banc have been addressed by the panel opinion and are without merit.

The petition for rehearing having been denied by the panel to whom the case was argued and submitted, and no member of the panel or judge in regular active service on the court having requested that the court be polled on rehearing en banc, Rule 35, Fed.R.App.P., the suggestion for rehearing en banc is denied.